

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 23, 2022**

United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Bankruptcy Case No. 14-32911-sgj13** |
| **CRISTINA ANGELINA NERIA** | § | |
| | § | **Chapter 13** |
| Debtor | § | |
| | § | |
| **CRISTINA ANGELINA NERIA** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Adversary No. 16-03148** |
| | § | |
| **(1) WELLS FARGO BANK, N.A. d/b/a AMERICA'S SERVICING COMPANY, and** | § | |
| | § | |
| **(2) WILMINGTON TRUST, NATIONAL ASSOCIATION, as Successor Trustee to Citibank, N.A., as Trustee for Bear Sterns Asset Backed Securities I Trust 2006-HE4 Asset-Backed Certificates, Series 2006-HE4** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

### AMENDED[1] FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CHAPTER 13 DEBTOR'S NUMEROUS CAUSES OF ACTION ASSERTED AGAINST MORTGAGE SERVICER[2]

## I. INTRODUCTION

In the above-referenced adversary proceeding (the "Adversary Proceeding"),[3] Cristina Angelina Neria, an individual Chapter 13 Debtor (the "Debtor"), has sued Wells Fargo Bank, N.A. d/b/a America's Servicing Company ("Wells Fargo"), the servicer of her home equity loan, alleging numerous incidents of servicer misconduct.[4]

Specifically, the Debtor alleges the following against Wells Fargo: (a) misapplication of her mortgage payments (in some cases, allegedly holding funds in suspense while the mortgage debt accumulated interest); (b) improper retention of post-petition interest paid on pre-petition arrearages—putting the post-petition interest collected in a "fee bucket," as opposed to forwarding such interest to the actual mortgage holder to apply to her loan; (c) escrow errors, including a failure to return an escrow surplus at one point – instead holding it for many months post-petition; (d) multiple failures to file payment change notices when required, pursuant to Bankruptcy Rule 3002.1; (e) failure to adequately respond to RESPA[5] requests (in some cases, alleging that Wells Fargo provided incomplete and misleading information regarding the Debtor's payment history and account balance); and (f) violations of the automatic stay by, among other things, collecting

---

[1] This document has been amended solely to add a new footnote: new footnote 145. This was done pursuant to Plaintiff's Motion to Reconsider filed September 5, 2022 [DE # 292] and argued November 22, 2022.
[2] As described herein, a Judgment will be forthcoming after a hearing to determine appropriate attorneys' fees and expenses to be awarded to the Debtor.
[3] Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b), and core matters are involved, pursuant to at least 28 U.S.C. § 157(b)(2)(B), because all causes of action are intertwined with a proof of claim of a defendant herein.  Moreover, all parties have consented to the bankruptcy court entering final judgments in this Adversary Proceeding.
[4] Wells Fargo acted as servicer for Wilmington Trust, National Association ("Wilmington"), as successor trustee to Citibank, N.A., as trustee for Bear Stearns Asset Backed Securities I Trust 2006-HE4 Asset-Backed Certificates, Series 2006-HE4. Wilmington was originally a defendant in this lawsuit, but the Debtor has settled her claims against Wilmington.
[5] The Real Estate Settlement Procedures Act found at 12 U.S.C. § 2605(e)-(f).

pre-petition debt through post-petition payments – specifically, by collecting pre-petition escrow shortages through post-petition mortgage payments. The Debtor also complains that Wells Fargo improperly strung her along in a loan modification process that lasted years, even though Wells Fargo knew the Debtor did not qualify, all the while with the mortgage debt accumulating interest. The Debtor alleges multiple legal claims or causes of action including breach of contract; violation of RESPA; violation of the FDCPA;[6] violations of Bankruptcy Rule 3002.1; willful violation of the automatic stay; abuse of bankruptcy process; and attorney's fees. The overarching theme in the Adversary Proceeding is that Wells Fargo has systemic problems dealing with Chapter 13 debtors.

Wells Fargo defends by conceding that it did make a few minor mistakes, but the Debtor has blown them out of proportion. For example, Wells Fargo admits, on one occasion, mistakenly sending ***another*** borrower's insufficient funds check to the Debtor with a letter indicating the Debtor would now have to make all her payments in certified funds (an event that the Debtor alleges caused her significant stress). Additionally, Wells Fargo acknowledges that mistakes may have been made regarding some escrow procedures (for example, allowing an escrow surplus to exist for several months—before refunding approximately $4,700 to the Chapter 13 Trustee), but asserts that the Debtor was usually underfunded on her escrow. And Wells Fargo's primary witness conceded that there were "a few misapplications of payments" in this case by Wells Fargo and a couple of RESPA responses may not have been timely.[7] But Wells Fargo asserts that the Adversary Proceeding boils down to only about five, ***supposed*** servicing infractions: (i) Wells Fargo's retention (and non-application) of post-petition interest on pre-petition arrearages interest; (ii) escrow-related procedures; (ii) its overall application of payments during bankruptcy; (iv) its

---

[6] The Fair Debt Collection Practices Act found at 15 U.S.C. § 1692.
[7] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 68:12-15.

responses to numerous RESPA requests for information; and (v) mistakenly sending another borrower's insufficient funds check to the Debtor.  And it also stresses that the Debtor was behind on her home equity loan, from the time it began servicing it, back in April 2006 (the loan was only executed on November 22, 2005).

The court held a trial over four days and heard testimony from 12 witnesses.[8]  The court admitted more than 600 exhibits (many of them very lengthy).  The parties submitted voluminous post-trial briefing.

Generally, "servicer misconduct" lawsuits like this one are extremely challenging because there are few human fact witnesses.  In the modern world of mortgage servicing, so much of the necessary activity is automated, and no individual human is assigned to any one particular borrower.  Also, the typical servicer's use of acronyms, code numbers, and "screenshots" (rather than layman concepts) seem to obscure rather than clarify the facts.  Moreover, the human beings involved appear to have a lack of discretion when it comes to decision-making.

As set forth below, while mistakes were made here by Wells Fargo, the court has determined that very few mistakes were actionable or resulted in actual damages.  Therefore, as set forth below, the Debtor will be awarded only a fraction of the damages she is seeking.[9]

## II. STIPULATED FACTS

These are the "Stipulated Facts" jointly submitted by the parties.[10]  The subheadings have been added by the court for ease of reading.

---

[8] This Adversary Proceeding took many years to go to trial due to extensive discovery; unsuccessful settlement attempts; and then COVID-19 delays.

[9] The Debtor seeks a total of $819,290.12 in damages.  That amount consists of $62.21 for mileage; $20,245.25 for interest paid to Wells Fargo; $94,000 for lost income, credit damage, and loss of opportunity; $113,157.66 for attorney's fees (as of July 26, 2017); $100,000 for emotional distress; $37,825 for damage to the house; $454,000 for statutory damages under TILA, RESPA, and the FDCPA.  Plaintiff's Exhibit 106 at 8 and *Transcript of Hearing Held June 30, 2021* [DE # 278] at 99:4.  The Debtor also urged the court to consider a punitive damages award of at least $3 million.  *Plaintiff's Trial Brief* [DE # 203] at 26.

[10] *Joint Pretrial Order* [DE # 270].

### A. Parties

Cristina Angelina Neria is the debtor in *In re Cristina Angelina Neria*, Case Number 14-32911-sgj13, filed in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.  The Debtor was also the debtor in a prior Chapter 13 case, *In re Cristina Angelina Neria*, Case Number 11-36319-hdh13, also filed in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "2011 Bankruptcy").

Wells Fargo services (or has serviced) mortgages under the name of its mortgage division, Wells Fargo Home Mortgage, and under the name America's Servicing Company ("ASC").

On or about November 22, 2005, the Debtor executed a fixed rate Texas Home Equity Note (the "Note") with Aames Funding Corporation DBA Aames Home Loan ("Aames") in the amount of $91,700.00, which was secured by a Texas Home Equity Security Instrument (the "Security Instrument") against the Debtor's homestead property at 9106 Boundbrook Avenue, Dallas, Texas 75243 (the "Property").  The Note and Security Instrument are referred to herein as the "Mortgage Loan" or the "Loan."  The Debtor's Mortgage Loan is a 15-year scheduled monthly payment home equity loan with annual interest accruing at the fixed rate of 10.86%.  The Debtor owns a 50% interest in the Property, with the other 50% interest owned by her mother; however, the Debtor is the sole obligor on the Note.  The funds obtained from the Mortgage Loan were used for, among other things, paying off the existing lien against the property and for the benefit of the business of the Debtor's mother.

Aames was the lender and original servicer for the Debtor's mortgage loan.  The first scheduled payment on the Debtor's mortgage loan was due January 1, 2006.  The January,

---

February, and March 2006 monthly mortgage payments came due during the time when Aames served the Debtor's loan.

Wells Fargo acquired servicing of the Debtor's Loan in April of 2006. At the time that Wells Fargo acquired the servicing rights for the Debtor's Mortgage Loan, Wells Fargo's records indicated that the Debtor's Loan was due for the March and April 2006 monthly payments. Wells Fargo was the servicer for the owner of the Debtor's Mortgage Loan in both of the Debtor's Chapter 13 bankruptcies.

The current owner of the Debtor's Mortgage Loan is Wilmington Trust, National Association, as Successor Trustee to Citibank, N.A., as Trustee for Bear Sterns Asset Backed Securities I Trust 2006-HE4 Asset-Backed Certificates, Series 2006-HE4 ("Wilmington"). At the time the Debtor filed her 2011 Bankruptcy, the trustee for the trust that owns the Debtor's Loan was Citibank, N.A.

**B. Financial Distress of the Debtor**

In 2008, the Debtor experienced extreme financial hardship due to an unexpected discontinuance of child support income and the halt of construction in Dallas at the onset of the economic recession. Also in 2008, Wells Fargo added an escrow account to the Debtor's originally non-escrowed loan, raising the Debtor's payment by almost $584.07 per month.

Beginning in 2008, Wells Fargo offered to consider the Debtor for HAMP and non-HAMP modifications on multiple occasions. Between 2008 and 2010, the Debtor completed multiple HAMP and non-HAMP loan modification application forms that Wells Fargo provided to the Debtor for consideration of a possible modification of her Mortgage Loan, and, in connection with the loan modification application process, the Debtor provided Wells Fargo with documentation and explanations regarding her financial circumstances and her mother's business income,

including among other things, profit and loss statements for her mother's business.  However, Wells Fargo did not modify the Debtor's Loan at any time between 2008 and 2010.

### C. The 2011 Bankruptcy

The Debtor filed her 2011 Bankruptcy, Case No. 11-36319-hdh-13 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division on October 3, 2011.  The Debtor's original Chapter 13 Plan proposed, among other things, to pay the entire scheduled principal balance of her mortgage loan, with 5.5% interest, through her Chapter 13 Plan via Chapter 13 Trustee disbursements.  Wells Fargo objected to confirmation of the Debtor's first proposed plan.

On December 23, 2011, the Debtor filed an Amended Chapter 13 Plan, which proposed, among other things, to pay the entire scheduled principal balance of her Mortgage Loan through the Chapter 13 Plan and increasing the rate of interest to be paid to 10.75%.  On January 16, 2012, Wells Fargo, as servicer, filed an Objection to Confirmation of Amended Chapter 13 Plan, asserting, among other things, that the principal balance on Wilmington's secured claim was $119,526.62 with a pre-petition arrearage balance of $55,479.66.

On February 1, 2012, the Debtor filed another Amended Chapter 13 Plan, which proposed, among other things, to pay the entire scheduled principal balance of her Mortgage Loan through the Chapter 13 Plan with interest to be paid at 10.75%.  On February 15, 2012, Wilmington, through its servicer Wells Fargo, filed an Objection to Confirmation of Amended Chapter 13 Plan, asserting, among other things, that the principal balance was $119,526.62 with a pre-petition arrearage balance of $55,479.66.

On February 16, 2012, the bankruptcy court orally denied confirmation of the Debtor's Amended Chapter 13 Plan.

On February 21, 2012, Wilmington, through its servicer Wells Fargo, filed Claim No. 4, claiming a principal balance of $119,526.62 with a pre-petition arrearage balance of $55,479.66 on behalf of creditor Citibank, N.A., as Trustee for Bear Sterns Asset Backed Securities I Trust 2006-HE4 Asset-Backed Certificates, Series 2006-HE4.  Wells Fargo did not file a proof of claim on its own behalf in the Debtor's 2011 Bankruptcy.

Wells Fargo and the Debtor resolved Wilmington's objection to confirmation by agreeing that the issues presented in Wilmington's objection would ultimately be determined through the Trustee's Recommendation Concerning Claims ("TRCC") process.  On May 4, 2012, Judge Hale confirmed Plaintiff's third plan, incorporating the agreement that Wilmington's objections would be determined through the TRCC process.  On June 28, 2012, the TRCC was filed, which provided for, among other things, payment of Wilmington's pre-petition arrearage balance of $55,479.66 by the Chapter 13 Trustee, with interest on the arrearage amount to be paid at the rate of 10.75%, and direct payment of ongoing mortgage payments by the Debtor.

On June 29, 2012, Wilmington, through its servicer, Wells Fargo, filed a motion for relief from stay in the Debtor's 2011 Bankruptcy.  On November 26, 2012, Wilmington, through its servicer, Wells Fargo, and the Debtor entered into an agreed order resolving the motion for relief Wells Fargo filed on Wilmington's behalf in the Debtor's 2011 Bankruptcy.

The Chapter 13 trustee filed a motion to dismiss the 2011 Bankruptcy for insufficient plan on September 4, 2012.  That motion was granted on January 15, 2013.  On January 29, 2013, the Debtor filed a motion to vacate the dismissal and reinstate her 2011 Bankruptcy.  The Chapter 13 Trustee agreed to the reinstatement.  On April 3, 2013, the Debtor's 2011 Bankruptcy was reinstated.

On June 22, 2013, the Debtor filed an objection to Wilmington's proof of claim.   On October 28, 2013, Wilmington, through its servicer Wells Fargo, and the Debtor entered an agreed order on her objection to the claim, allowing Wilmington's pre-petition arrearage claim in the Debtor's 2011 Bankruptcy in the amount of $52,339.20.

The court entered an order on the TRCC on October 31, 2013, which required the Debtor to cure Wilmington's pre-petition arrearage claim with interest on the arrearage to be paid at 10.86% and required the Debtor to maintain her ongoing monthly post-petition payment obligations by making post-petition monthly mortgage payments directly to Wells Fargo as servicer.

The order on the TRCC was amended on November 27, 2013, to correct the amount of the arrearage claim in Wilmington's Proof of Claim No. 4 from $119,526.62 (the full balance of the Debtor's mortgage loan) to $52,339.20 (the agreed and allowed amount of the arrearage amount in Wilmington's proof of claim).   The order on the TRCC was amended a second time on February 18, 2014, to lower the Debtor's plan base, and modify her plan to reduce her monthly trustee payment to $505.00 beginning with the March 2014 payment.

Prior to entry of the original order on the TRCC in the Debtor's 2011 Bankruptcy, the Chapter 13 Trustee disbursed $8,275.96 to Wilmington (via its servicer, Wells Fargo) that the Trustee's records describe as payment of interest on Wilmington's claim.   Subsequent to the entry of the original order on the TRCC in the Debtor's 2011 Bankruptcy, the Chapter 13 Trustee disbursed $2,368.73 to Wilmington (via its servicer, Wells Fargo) that the Trustee's records describe as payment of interest on Wilmington's claim.   The Chapter 13 Trustee's records reflect that the Trustee paid Wilmington, through its servicer Wells Fargo, "Trustee Interest" in the Debtor's 2011 Bankruptcy in the total amount of $10,221.59.

The Debtor's 2011 Bankruptcy was dismissed by an order entered on March 12, 2014, then reinstated on April 21, 2014, then dismissed again on May 12, 2014.

### D. The 2014 Bankruptcy

On June 17, 2014, the Debtor then filed her second Chapter 13 bankruptcy case, Case No. 14-32911 (the "2014 Bankruptcy"), which is currently pending in this court.  The Debtor's amended plan in her 2014 Bankruptcy provides that the Debtor is to cure her mortgage arrears through her payments to the Chapter 13 Trustee and that she is to maintain her ongoing post-petition mortgage obligations through direct monthly payments to Wells Fargo, as servicer for Wilmington.

The Debtor's amended Chapter 13 plan was confirmed on November 20, 2014.  The Debtor's confirmed plan in her 2014 Bankruptcy authorized the Trustee to distribute proceeds from the Debtor's Chapter 13 plan payments exclusively to creditors with allowed claims.

The Chapter 13 Trustee's records in the Debtor's 2014 Bankruptcy reflect that the Trustee has paid Wells Fargo, as servicer for Wilmington, interest on Wilmington's pre-petition arrearage claim in the total amount of $10,023.66.  Wells Fargo retained $18,609.85 in interest paid on Wilmington's proofs of claim during the Debtor's 2011 and 2014 Bankruptcies.

Wilmington filed a proof of claim in the Debtor's 2014 Bankruptcy case on July 11, 2014. Wilmington's proof of claim (Claim 2-1) in this case asserts that the Debtor's pre-petition mortgage arrears, *i.e.,* "the amount necessary to cure the default as of the petition date," is $48,522.09.  Wells Fargo did not file a proof of claim on its own behalf in the Debtor's 2014 Bankruptcy.

The Debtor has made all post-petition payments during the 2014 Bankruptcy, including monthly payments of $1,471.01 for July 2014 through May 2015.

Wells Fargo filed its December 9, 2015 response unopposed to the Trustee's November 24, 2015 Notice of Amount Deemed Necessary to Cure, stating that the Debtor was current on her post-petition mortgage payments, fees, and costs as of the date of response.

On January 19, 2016, the Debtor filed a motion for 2004 examination seeking information regarding her mortgage loan and the examination of certain Wells Fargo employees.

### E.  The Returned Escrow Overage

Wells Fargo sent a check in the amount of $4,671.27 to the Chapter 13 Trustee in connection with the Debtor's 2014 Bankruptcy on or about March 10, 2016.

The March 10, 2016 correspondence from Wells Fargo to the Chapter 13 Trustee included an escrow account disclosure statement dated March 4, 2016, which explains that the $4,671.27 check was for "[a]n Escrow Adjustment of $4,449.56, scheduled to be repaid through the bankruptcy. . . ." plus overstated "lowest projected escrow account balance (low point)" of $221.71.

The Chapter 13 Trustee is currently holding the funds in the amount of $4,671.27 sent by Wells Fargo.

On August 5, 2016, the Debtor filed a response objecting to the TRCC in her 2014 Bankruptcy.

The Debtor completed her Chapter 13 plan.  The Chapter 13 Trustee has a balance on hand in the Debtor's case in the amount of $40,082.82.

### F.  The Alleged RESPA Correspondences

On October 12, 2015, the Debtor, through her counsel, sent a letter to Wells Fargo (the "October 12, 2015 Letter").  The October 12, 2015 Letter was received by Wells Fargo employee Joann Miller on October 16, 2015.  A letter purporting to be signed by Wells Fargo employee

Leesa Whitt-Potter acknowledged receipt of the October 12, 2015 Letter in a letter dated October 16, 2015. In a letter dated November 16, 2015, Wells Fargo informed the Debtor that while Wells Fargo intended to respond to the October 12, 2015 Letter by November 16, 2015, Wells Fargo now expected to complete its work by December 1, 2015.

On December 15, 2015, the Debtor, through her counsel, sent a letter to Wells Fargo (the "December 15, 2015 Letter") requesting an immediate response to her October 12, 2015 Letter. Joann Miller signed for receipt of the December 15, 2015 Letter on December 20, 2015. A letter purporting to be signed by Whitt-Potter acknowledged receipt of the December 15, 2015 Letter in a letter dated December 22, 2015. In a letter dated December 31, 2015, Vladimir Belikov of Wells Fargo responded to the December 15, 2015 Letter, alleging that a response to the October 12, 2015 Letter was sent on November 16, 2015, with a copy of the alleged November 16, 2015 Response. A letter purporting to be signed by Whitt-Potter of Wells Fargo informed the Debtor that Wells Fargo intended to respond to the December 15, 2015 Letter by January 22, 2016, in a letter dated January 8, 2016.

The Debtor, through her counsel, sent another letter to Wells Fargo on January 21, 2016 (the "January 21, 2016 Letter"). Wells Fargo employee Joann Miller received the January 21, 2016 Letter on January 24, 2016. A letter purporting to be signed by Whitt-Potter of Wells Fargo acknowledged receipt of the January 21, 2016 Letter in a letter dated January 25, 2016, indicating an anticipated response date of February 8, 2016. In a letter dated February 22, 2016, Timothy Bolten of Wells Fargo informed the Debtor that while Wells Fargo intended to respond to the January 21, 2016 Letter by February 22, 2016, Wells Fargo now expected to complete its work by March 7, 2016. In a letter dated March 7, 2016, Timothy Bolten of Wells Fargo informed the Debtor that while Wells Fargo intended to respond to the January 21, 2016 Letter by March 7,

2016, Wells Fargo now expected to complete its work by March 21, 2016.  Timothy Bolten of

Wells Fargo, through a letter dated March 21, 2016, informed the Debtor that Wells Fargo would

not be responding to the January 21, 2016 Letter allegedly because the account was in active

litigation.

On June 2, 2016, the Debtor, through her counsel, sent a letter to counsel for Wells Fargo

(the "June 2, 2016 Letter") regarding a letter sent to the Debtor on May 4, 2016, by Wells Fargo.

R. G. Dickens of Locke Lord LLP signed the certified mail return receipt evidencing receipt of the

June 2, 2016 Letter on June 7, 2016.  Counsel for Wells Fargo acknowledged receipt of the June

2, 2016 Letter in a letter dated June 9, 2016.  In a letter dated July 14, 2016, counsel for Wells

Fargo informed the Debtor that Wells Fargo needed additional time to investigate the issues raised

in the June 2, 2016 Letter, and that Wells Fargo would provide a response within 15 business days

of the July 14, 2016 letter.  In a letter dated August 4, 2016, counsel for Wells Fargo responded on

behalf of Wells Fargo to the June 2, 2016 Letter.

All letters at issue in this lawsuit which the Debtor claims constitute communications from

her to Wells Fargo subject to the Real Estate Settlement and Procedures Act ("RESPA"), were

sent by the Debtor's counsel.  Wells Fargo denies that any aspect of its responses to the Debtor's

correspondence described herein was deficient.

### G.  Debtor's Objection to Proof of Claim

On September 29, 2016, the Debtor filed an objection to Wilmington's claim No. 2,

asserting that Wells Fargo misapplied payments in violation of the payment application provisions

set forth in the underlying Note and Security Instrument.

### H. The *Green* Settlement

On or about November 19, 2015, Wells Fargo entered into a settlement with the United States Trustee's office in *In re Green*, Case No. 11-33377, filed in the United States Bankruptcy Court for the District of Maryland. Based on this settlement, Wells Fargo agreed to provide certain relief to borrowers affected by the practices that were the subject of the United States Trustee's findings. In December 2016, Wells Fargo made adjustments to the Debtor's account pursuant to the *Green* settlement, including a credit in the amount of $333.

### I. Wells Fargo's Retention of Post-petition Interest on Pre-petition Arrearages

Wells Fargo has not applied interest received on Wilmington's claim toward any contractual payment, fee, expense, or escrow item.

### III. COURT'S ADDITIONAL FINDINGS OF FACT

These are additional relevant facts supported by the evidence at trial.

The Debtor's mother and father originally bought the Property in 1989. The Debtor's mother credibly testified that they paid $60,000 for the house in 1989 and that she believes it is now worth $233,000. At some later point, the Debtor's mother and father divorced. The Debtor obtained her father's 50% interest in the home. The home equity loan at issue in this Adversary Proceeding was obtained solely by the Debtor (*i.e.*, her mother was not an obligor) on November 22, 2005. The proceeds of the home equity loan were used to pay off a prior mortgage (on which the Debtor's mother and father were liable) and for funding the Debtor's mother's business. The Debtor also worked for this business.

The Debtor was in default during a significant portion of the life of her loan, including very early on, when Wells Fargo began servicing it in April 2006. The Debtor was behind on her loan

at various points in 2006, 2007, 2008, 2009, and only made one payment in 2010 in connection

with a HAMP trial.   She made no payments in 2011, the year that she filed her first bankruptcy.[11]

### A. Alleged Misapplication of Loan Payments and Improper Retention by Wells Fargo (as Servicer) of Post-petition Interest on Pre-petition Arrearages

A close inspection of the 2011 Bankruptcy reveals that the Debtor's first few Chapter 13

plans contained a rather-shocking error that escalated into massive confusion and an accounting

kerfuffle that permeates this Adversary Proceeding.   The parties have construed the plan error to

mean that the Debtor's first plans were "paid-in-full" plans.   Their interpretation has ramifications

regarding the propriety of Wells Fargo's application of loan payments, retention of interest on

arrearage, and obligation to file payment change notices under Fed. R. Bankruptcy Procedure

3002.1 ("Rule 3002.1").   Below, the court will discuss why the evidence reveals that these early

plans should ***not*** be regarded as "paid-in-full" plans, and the impact of this on the Debtor's claims

herein.

On October 3, 2011 (the petition date of the 2011 Bankruptcy), the Debtor filed what both

parties are calling a "paid-in-full plan" (sometimes referred to as a "whole-loan plan"), meaning

that, rather than the typical "cure-and-maintain" plan that Chapter 13 debtors often propose, the

Debtor proposed paying off her entire mortgage balance (*i.e.*, principal and all accrued arrearages

such as interest, escrows, and fees) over the proposed 59-month life of her form-generated plan.[12]

***The court believes that, frankly, both parties are fundamentally distorting what the Debtor's***

***first plan did***.   The plan actually placed the Debtor's home mortgage loan in the section of the

form-generated Chapter 13 plan entitled **"Section 1325(a)(9) claims"** which is intended for "debts

incurred by the Debtor within 910 days of the Petition date secured by a purchase money security

---

[11] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 91:5-92:18; Defendant's Exhibit 86.
[12] Plaintiff's Exhibit 8.

interest in a motor vehicle acquired for the personal use of the debtor or debts incurred within one year of the petition date secured by any other thing of value." In other words, ***she put the Debtor's home mortgage in the wrong section of the form-generated plan*** – the section intended for secured indebtedness associated with car purchase money loans (or other recently obtained secured loans), ***which indebtedness cannot be "crammed down."*** The Debtor had no "910" car loan. She had no other secured debt incurred recently. Moreover, her plan showed only four unsecured creditors with $1,750 worth of general unsecured debt. The claims register for the 2011 Bankruptcy shows only four proofs of claim: the mortgage debt servicing company; two taxing authorities; and one small unsecured claim. The 2011 Bankruptcy was "all about" the mortgage and the Debtor's first attorney made an epic error in putting that mortgage debt in the wrong section of the form-generated plan.

Sadly, the Debtor began the 2011 Bankruptcy being represented by an attorney that has since lost her license to practice law. In any event, if the Debtor ever had the intention back in 2011 of paying off her entire mortgage over the life of her plan (the court does not believe she ever did, by the way), this seemed rather inexplicable—not to mention infeasible (the mortgage was not scheduled to mature until December 31, 2020). Chapter 13 debtors do not typically do this; rather, they take full advantage of Section 1322(b)(5)'s tool whereby debtors can simply cure mortgage arrearages over the (usually) 60-month, life of a plan and resume normal post-petition contractual payments (*i.e.*, through what's known as a "cure-and-maintain plan"). The Debtor here could not afford to pay off her entire mortgage over the life of the plan. Moreover, the Debtor's plan payments of $1,800 did not make sense if this is what the Debtor wanted to do. Naturally, the Trustee objected to the plan as did the mortgage holder.[13]

---

[13] Defendant's Exhibit 90.

The Debtor next filed an Amended Plan on December 23, 2011, that had the same anomaly. Again, she placed the mortgage indebtedness in the section of the plan designed for Section 1325(a)(9) "910" claims. And again, the parties consistently refer to these early plans as "paid-in-full plans" or "whole loan plans," but this seems to completely distort the real issue: *the Debtor's prior attorney put the mortgage in the wrong section of the plan—a section intended for car loans that cannot be "crammed down" in Chapter 13*. These early plans were denied confirmation on January 12, 2012. The Debtor filed yet another plan on February 1, 2011, that had the same anomaly. The Trustee once again objected on February 3, 2011, stating among other things: "The trustee is unable to ascertain debtor's treatment of mortgage claim. Plan appears to provide for full payment of mortgage balance through the plan, but Sch. J includes a mortgage payment."[14] The mortgage company also objected on February 15, 2012, stating among other things: "Debtor's Amended Chapter 13 Plan (the "Plan") alleges the debt owed to ASC is $81,904.00 and proposes to pay the entire Claim over the life of the Plan at 10.75%. … It attempts to modify the terms of the Claim in violation of Section 1322(b)(2)."[15] Finally, the court confirmed the plan on May 4, 2012, but with the caveat that approval was subject to the TRCC.[16] Specifically, there was a special provision that stated: "Additional Agreements for Confirmation. The issues presented in America's Servicing Company's Objection to Plan are passed to the TRCC for resolution at that time." Meanwhile, before the TRCC was set for hearing, the mortgage servicer filed a motion to lift stay, arguing the Debtor was delinquent on payments.[17] An Agreed Order

---

[14] *Trustee's Objection to Confirmation of Chapter 13 Plan*, Case. No. 11-36319-hdh13 [DE # 36].
[15] *America's Servicing Company's Objection to Confirmation of Plan*, Case. No. 11-36319-hdh13 [DE # 37].
[16] Defendant's Exhibit 7; *Order Confirming Chapter 13 Plan*, Case. No. 11-36319-hdh13 [DE #47].
[17] *America's Servicing Company's Motion for Relief from Stay*, Case. No. 11-36319-hdh13 [DE # 52].

was finally reached on November 27, 2012, that—like the plan—was confusing.[18]  It provided in

pertinent part that:

> Debtor shall provide for payment of $119,526.62, the total debt owed to Movant, to be paid together with 10.86% interest, through the Chapter 13 Plan.  Debtor reserves the right to file an objection to the current proof of claim which sets forth the total debt owed on the Property.  In the event that the total debt is adjusted by agreement or by the court as a result of an objection to claim, the debtor shall only be required to pay the agreed upon total debt through the Chapter 13 Plan.

It is unclear why the parties would agree to a total amount of debt and then in the next sentence

agree that the Debtor may object to the debt.  In any event, the court dismissed the 2011 Case

shortly thereafter on January 15, 2013 —apparently due to some mistake—and then reinstated it

on April 3, 2013.[19]

For the next few months there was activity on the Trustee's TRCC, his objections to the

mortgage servicer's proof of claim, and a response and an agreed order thereon.   Most

significantly, the Order on TRCC ultimately changed the Debtor's plan to clearly establish that it

was a "cure-and-maintain" plan.  This occurred on October 31, 2014, and was amended on

November 27, 2013, and February 19, 2014.[20]  However, even though the Order on TRCC finally

clarified that the plan would be a "cure-and-maintain plan," ***there still seemed to a requirement***

***that post-petition interest be paid on the pre-petition mortgage arrearage*** – this was something

that was inexplicably in all prior versions of the Debtor's plan.  The 2011 Bankruptcy was

ultimately dismissed without reinstatement on May 12, 2014.[21]

---

[18] *Agreed Order Conditioning Stay*, Case. No. 11-36319-hdh13 [DE # 74].

[19] *Order Granting Trustee's Motion to Dismiss Case*, Case. No. 11-36319-hdh13 [DE # 78] and *Order Granting Motion to Vacate Dismissal Order and Reinstate*, Case. No. 11-36319-hdh13 [DE #83].

[20] *Order on Trustee's Recommendations Concerning Claim, Objection to Claims, and Plan Modification*, Case. No. 11-36319-hdh13 [DE # 108]; *Amended Order on Trustee's Recommendations Concerning Claim, Objection to Claims, and Plan Modification*, Case. No. 11-36319-hdh13 [DE # 110]; *Amended Order on Trustee's Recommendations Concerning Claim, Objection to Claims, and Plan Modification*, Case. No. 11-36319-hdh13 [DE #115].

[21] *Order Dismissing Debtor without Prejudice*, Case. No. 11-36319-hdh13 [DE # 122].

The Debtor filed her 2014 Bankruptcy on June 17, 2014 (only about five weeks after the dismissal of her prior case).  Her plan filed on the same date was indisputably a "cure-and-maintain" plan (the Debtor's former counsel finally used the correct spaces on the form-generated plan for a mortgage arrearage and for ongoing direct mortgage payments).  However, the plan proposed once again to pay post-petition interest on the pre-petition mortgage arrears.  The court denied confirmation of that plan on September 8, 2014.[22]  Then, on November 21, 2014, the court confirmed an amended "cure-and-maintain" plan that once again proposed to pay post-petition interest on the mortgage arrears.[23]  Finally, after the Debtor substituted her previous counsel, her new counsel negotiated an Order on TRCC that removed the post-petition interest on the pre-petition mortgage arrearages, on January 19, 2017.[24]  The Debtor completed her plan on or around June 24, 2020.

What is the point of recounting this tedious history?  ***The point is that this court believes it is wholly incorrect to suggest that there was a phase of the 2011 Bankruptcy where there was a "paid-in-full plan" before a separate "cure-and-maintain" phase***.  Not only was the "paid-in-full plan" based on a clear mistake (*i.e.*, nonsensically putting the whole mortgage balance into a section of the form Chapter 13 plan intended for "910" car loans), but the so-called "paid-in-full plan" was always subject to the TRCC process, which, at long last, resulted in amending the plan to clearly be a "cure-and-maintain plan."  The court believes that Wells Fargo always knew the so-called "paid-in-full plan" was a mistake (and paying post-petition interest on the full loan balance – inclusive of a pre-petition arrearage – was a mistake).  This is why Wells Fargo (as later

---

[22] *Order Denying Confirmation of Chapter 13 Plan*, Case No. 14-32911-sgj13 [DE # 18].
[23] *Order Confirming Chapter 13 Plan*, Case No. 14-32911-sgj13 [DE # 26].
[24] *Order on Trustee's Recommendation Concerning Claims, Objection to Claims, and Plan Modification*, Case No. 14-32911-sgj13 [DE # 96].

explained) accounted for this post-petition interest on pre-petition arrearage in an ambiguous "fee" bucket instead of forwarding it to the actual loan holder to apply it to the loan.

Wells Fargo's primary witness testified that a servicing agreement between it and the lender/holder allowed Wells Fargo to keep the extra payment it received for post-petition interest on the mortgage arrearages.[25]  However, nothing was presented in evidence that expressly allowed Wells Fargo to keep the "interest" on the mortgage arrearage as a "fee."  Wells Fargo kept and did not apply $9,763.50 in the 2011 Bankruptcy and $8,846.35 in the 2014 Bankruptcy.[26]  Even after the court dismissed the Debtor's 2011 Bankruptcy, Wells Fargo did not release this post-petition interest on arrearage or—more specifically—it did not re-amortize the loan, to put it back to what the contract required, and apply the post-petition interest to the loan balance in accordance with the contract between the Debtor and lender.  Wells Fargo still has these funds – accounting for them in a "Fee" bucket.  Expert witness Mr. Patterson credibly testified that in other jurisdictions, this $18,609.85 would have been applied to the loan balance[27] (it is uncommon in the Northern District of Texas for post-petition interest on pre-petition mortgage arrearages to be included in a plan – even in "cure-and-maintain" plans, much less in a paid-in-full plan).  As later explained in the Conclusions of Law section, the court finds this retention of post-petition interest to have been improper under at least Sections 1322(e) and 362(a)(3) of the Bankruptcy Code.

### B.  Alleged Failure to File Payment Change Notices Under Rule 3002.1(b)

The Debtor complains that Wells Fargo filed no payment change notices in the 2011 Bankruptcy and that it was required to do so.[28]  In analyzing this, the court first observes that the evidence shows an inconsistency in Wells Fargo's proof of claim and escrow account disclosure

---

[25] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 230:11-15.
[26] *Transcript of Hearing Held June 29, 2021* [DE # 271] at 84:5 and 86:6.
[27] *Id.* at 61:5-10.
[28] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 59:6-12.

statements, on the one hand, and its accounting and the testimony of its representatives, on the other. According to Wells Fargo's first proof of claim filed in the 2011 Bankruptcy,[29] the Debtor's monthly payment amount was $1,744.64 as of the petition date.[30]  While it is somewhat unclear, it appears that this is what the payment had been throughout the time period of May 2009 to October 2011. In an escrow account disclosure statement dated October 6, 2011 (shortly after the Debtor filed her first bankruptcy), Wells Fargo notified the Debtor that her monthly payment would change from $1,744.84 to $1,366.42.[31]  The statement showed that $269 of "escrow shortage/prepayment" was being removed from the Debtor's monthly payment. In October of 2012, Wells Fargo performed an escrow analysis that was to become effective in December of 2012.[32]  In an escrow account disclosure statement dated October 16, 2012, Wells Fargo notified the Debtor that her monthly payment would change from $1,475.12 to $1,376.11.[33]

The trial testimony and its supporting documentary evidence revealed that Wells Fargo applied $1,475 to principal, interest, and existing escrow, at least from February through May of 2013.[34]  It also applied $269 it received to a separate accounting bucket for escrow shortages to prevent over-collecting escrow as the Debtor's shortfall grew.[35]  The $269 is absent in the Customer Account Activity Statement provided at Defendant's Exhibit 86 (which supported the testimony). However, $1,475 and $269 together make up the $1,744 monthly payment recorded in Wells Fargo's proof of claim. Wells Fargo also deducted an additional amount from the money it received as interest on arrearage, but it did not apply this amount to the loan during the bankruptcy case.

---

[29] Filed in the name of America's Servicing Company.
[30] Plaintiff's Exhibits 6 and 7.
[31] Plaintiff's Exhibit 379 at 012917.
[32] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 81:5-7.
[33] Plaintiff's Exhibit 379 at 012920.
[34] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 83:14-84:2 and Defendant's Exhibit 86 at 14-15.
[35] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 148:3-24.

Wells Fargo's primary witness, Bobby Jo Barrett ("Ms. Barrett") provided testimony that attempted to explain Wells Fargo's peculiar accounting.  She testified that the escrow analysis performed in October of 2012 did not change the amount that Wells Fargo applied to the Debtor's loan each month.[36]  When asked whether Wells Fargo had a reason to file a payment change notice, she said that it was "technically" not required because the Debtor's plan was a paid-in-full plan.[37]  She also testified that Wells Fargo never re-amortized the loan to be a paid-in-full plan because the process was "very involved to make sure that it's done correctly"[38] and "there were still some issues to be worked out that, you know, ultimately resulted in it being turned into a cure and maintain."[39]  Her testimony lacked consistency and fell short of an explanation of how the Debtor's monthly payments remained the same throughout the case.

An escrow account disclosure statement dated May 27, 2014, just after the dismissal of the 2011 Bankruptcy, reveals a change in the Debtor's monthly payment from $1,475.12 to $1,471.01.[40]  The monthly payment amount in this document appears to reflect the approximately $1,475 that Wells Fargo admittedly applied in 2013.  It does not capture the second escrow bucket that would have brought the monthly payment up to $1,744.64 (if all other accounting remained consistent).

In summary, the evidence shows that Wells Fargo filed no payment change notices in the 2011 Bankruptcy, but it did notify the Debtor twice that her payment amounts would change due to escrow adjustments.  Wells Fargo's accounting suggests that it applied a consistent amount to the Debtor's loan, but also that it did not re-amortize the loan to be a paid-in-full plan despite its

---

[36] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 83:16-18.
[37] *Id*. at 123:13-15.
[38] *Id*. at 84:13-14.
[39] *Id*. at 206:22-24.
[40] Plaintiff's Exhibit 359 at 012522.

escrow analyses.  All the while, Wells Fargo's accounting of a second, segregated escrow bucket is absent from the calculation, and Wells Fargo collected post-petition interest on pre-petition arrearage.

As earlier alluded to, this is massively confusing.  The accounting is opaque, to say the least. But the court determines payment change notices should have been filed during the 2011 Bankruptcy (as explained in the Conclusions of Law Section).

### C.  Alleged Escrow Errors

Regarding Wells Fargo's alleged escrow improprieties, it appears that Wells Fargo first put an escrow in place for the Debtor's loan way back in 2007, for Debtor's failure to pay taxes and due to a cancellation of insurance notice Wells Fargo received.[41]  The loan remained in escrow for the whole time thereafter.[42]  The only impropriety that this court detects from the evidence is that Wells Fargo did not timely adjust the escrow balance downward.  It did not apply to the Debtor's loan balance or refund to the Debtor an escrow surplus that manifested when the Debtor paid her 2014 taxes directly and notified Wells Fargo of the same in November 2014.[43]  Wells Fargo eventually refunded the $4,671.27 surplus to the Chapter 13 Trustee in 2016.[44]  However, that refund occurred unreasonably later—more than one year after discovering the surplus in 2015.

### D.  Alleged Impropriety in Loan Modification Attempts/Process

Regarding the loan modification attempts and Wells Fargo allegedly stringing the Debtor along unreasonably, it appears that there was at least one loan forbearance and a HAMP trial. Between 2009-2016, there were ten loan modification requests and denials: eight before and two

---

[41] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 93:4-94:4; Defendant's Exhibits 2, 107, and 108.
[42] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 95:24-96-1.
[43] *Id*. at 132:18-24; *Transcript of Hearing Held June 30, 2021* [DE # 278] at 129:4-9.
[44] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 131:15-23: Plaintiff's Exhibit 45.

after the Debtor's 2011 Bankruptcy.[45]  Apparently, these were denied for insufficient income and

an unacceptable loan-to-value ratio.[46]  A denial in 2016 was for the Debtor's failure to provide

information about her mother's business.  On one occasion, the Debtor chose to withdraw from a

modification process that was under review (September 2015).[47]  Apparently, modification options

were limited for the Debtor, since her loan had been a "Texas Cash Out" home equity loan (recall

that the Debtor had used the loan proceeds to pay a previous mortgage loan on the house on which

she was not liable—only her mother and father had been—and most of the remainder of the loan

proceeds were used for financing her mother's business).[48]  The facts regarding the Debtor's

mother's business are unclear.  The Debtor's mother testified that her business closed in 2012 and

she went to work for the Diocese of Dallas for about five years.[49]  She then testified that the

business continued after she went to work at the Diocese.  The Debtor's mother had some level of

sophistication.  She testified that between 2000-2005 she had worked for a law firm, for Deloitte,

also a bank, and an actuarial firm—although the court is unclear what her job at each was.  The

Debtor worked for or with her mother's business and, at some point, also FedEx at night.  In any

event, the trial testimony suggests that Wells Fargo reviewed the Debtor's modification requests

each time and that there were several possible options to alter the loan payments.[50]  Unfortunately,

there were also several reasons to deny modification.  The court finds no actionable conduct on

the part of Wells Fargo with regard to loan modifications.

---

[45] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 98:18-24.
[46] *Id*. at 99:5-15.
[47] *Id*. at 102:12-19.
[48] *Id*. at 226:20-227:20.
[49] *Id*. at 63:17.
[50] *Id*. at 227:7-20.

### E.  Alleged Violations of RESPA

Regarding the alleged RESPA response requirements and violations, the evidence shows that the Debtor's counsel sent requests for information under RESPA, seeking, among other things, her required loan payoff amount, because the mortgage lender's proof of claim in the 2014 Bankruptcy seemed high, considering the level of aggregate payments the Debtor made in the 2011 Bankruptcy Case.[51]

From the evidence, the court identified nine requests for information that potentially qualified as qualified written requests ("QWRs") and 28 responses to those requests.  At trial, the testimony of Ms. Megan Clontz addressed four written requests for information.  The Debtor's Trial Brief and Post-Trial Brief reference two more not mentioned at trial.  Further, the Debtor's exhibits include three more written requests that were not mentioned at trial or in the Debtor's briefs.[52]  Two letters in the Debtor's exhibits suggest that the Debtor sent yet one more request for information, but the court is unable to locate the request itself in the admitted evidence.  Each of the nine requests for information in the record includes the Debtor's name, the last four digits of the loan number, and the property address. The court notes that the Debtor's loan number changed between the fifth and sixth requests.  The court also notes that on December 1, 2018, Wells Fargo transferred servicing of the Debtor's loan to Specialized Loan Servicing LLC.  The transfer occurred between the June 2, 2016 Request and the December 4, 2018 Request (both defined in the table below).  The Debtor's requests and Wells Fargo's responses are as follows:

---

[51] Plaintiff's Exhibits 178-180.
[52] Plaintiff's Exhibit 178.

| Date of Debtor's Request | Information Requested and/or Errors Identified | Date of Response | Exhibit | Responses of Wells Fargo/ASC |
|---|---|---|---|---|
| 10/12/2015[53] | The "October 12, 2015 Request"<br><br>An itemized payoff balance.<br><br>A payoff balance.<br><br>A reinstatement statement.<br><br>The identity and contact information for the current owner, master servicer, and current servicer.<br><br>A proper crediting of all mortgage payments from November 2011.<br><br>An exact reproduction of the life of loan mortgage transaction history on the system of record (along with all codes used therein). | 10/16/2015 | PE-179 004604 | A letter acknowledging the October 17, 2015 Request. ASC stated that it will respond by October 30, 2015. |
| | | 10/26/2015 | PE-180 004622 | A letter from Vlad Belikov providing the first two items requested: a detailed, itemized payoff balance as of November 2, 2015, showing $87,526.41 as the total payoff amount. |
| | | 10/30/2015 | PE-179 004605 | An update letter. ASC stated that it will respond further to the October 12, 2015 inquiry by November 16, 2015. |
| | | 11/16/2015 | PE-179 004606 | An update letter. ASC stated that it will respond further to the October 12, 2015 inquiry by December 1, 2015. |
| | | 11/16/2015 | PE-180 004627 | A letter from Vlad Belikov providing the identity and contact information of the servicer and owner and also an account history from May 8, 2006, through November 5, 2015.<br><br>The letter stated that a reinstatement quote would be provided once the proof of claim has been filed. This made no sense since a proof of claim had been filed on July 11, 2014 in the amount of $105,290.84. |
| 12/15/2015[54] | The "December 15, 2015 Request"<br><br>Notice of Error: The Debtor stated that she had not received a response to the October 12, 2015 Request.<br><br>This was not true because ASC had responded – just not completely and in piecemeal fashion. | 12/22/2015 | PE-179 004607 | A letter acknowledging the Debtor's request for information. ASC will respond by January 6, 2016. |
| | | 12/31/2015 | PE-180 004648 | A letter from Vlad Belikov indicating that ASC responded to the October 12, 2015 Request on November 16, 2015 (enclosing it again with four additional pages, stating that it was current through January 4, 2016) and stating that ASC reviewed the Debtor's concerns and found that no error occurred. ASC would not adjust the account. |
| | ??? | 01/08/2016 | PE-179 004608 | A letter from Leesa Whitt-Potter addressed to Ms. Megan Clontz acknowledging a request for |

---

[53] Plaintiff's Exhibit 178 at 004473; *Transcript of Hearing Held June 30, 2021* [DE # 278] at 11:20-12:22. Wells Fargo received the October 12, 2015 Request by mail on October 16, 2015. Plaintiff's Exhibit 178 at 004479.

[54] Plaintiff's Exhibit 178 at 004481; *Transcript of Hearing Held June 30, 2021* [DE # 278] at 16:12-17:1. Wells Fargo received the December 15, 2015 Request by mail on December 20, 2015. Plaintiff's Exhibit 178 at 004491.

| | | | | |
|---|---|---|---|---|
| ???[55] | | | | information.  ASC will respond by January 22, 2016. |
| | | 01/12/2016 | PE-180 004674 | A letter from Timothy Bolton enclosing an account history from May 8, 2006, through November 5, 2015. |
| 01/21/2016[56] | The "January 21, 2016 Request" Notice of Error: (a) The spreadsheet you provided was manually generated instead of from the system of record; (b) The spreadsheet you provided is incomplete because payments have been sent and accepted since then; (c) You did not provide a reinstatement quote. | 01/25/2016 | PE-179 004609 | A letter from Leesa Whitt-Potter acknowledging the request for information.  ASC stated that it will respond by February 8, 2016. |
| | | 02/22/2016 | PE-179 004610 | An update letter from Timothy Bolton. ASC stated that it will respond by March 7, 2016. |
| | | 02/25/2016 | PE-180 004690 | An "Enterprise Fax" from Wells Fargo simply stated that any loan history request prior to April 1, 2006, (from the prior servicer) would be unavailable. |
| | | 02/26/2016 | PE-180 004693 | Identical to the Enterprise Fax dated February 25, 2016. |
| | | 03/07/2016 | PE-179 004611 | An update letter form Timothy Bolton. ASC stated that it will respond by March 21, 2016. |
| | | 03/21/2016 | PE-180 004695 | A letter from Timothy Bolton stated that ASC will not respond to the request for information because of ongoing litigation between the parties.  The letter included the litigation information. |
| 03/17/2016[57] | The "March 17, 2016 Request" This letter was sent to Wells Fargo's lawyers for the first time, and it requested: The identity and contact information of the owner of the mortgage. A copy of NOTS servicing notes and additional servicing notes. A P309 screenshot. A FEEI screenshot. | 03/18/2016 | PE-179 004612 | A letter from Locke Lord acknowledging the request for information. |
| | | 03/24/2016 | PE-180 004697 | A letter from Locke Lord providing the contact information of Wilmington Trust National Association, the owner. |
| | | 04/18/2016 | PE-181 004817 | An email from Locke Lord providing redacted copies of the loan notes and the PL05 screen print.  There is a gap in the archive notes from May 2013 to December 2015, and counsel had submitted a request to locate and retrieve the information. |

---

[55] Plaintiff's Exhibit 179 at 004608 and Plaintiff's Exhibit 180 at 004674 suggest that Ms. Megan Clontz sent a request for information on behalf of the Debtor on January 7, 2015.  The court could not locate the request itself in evidence.

[56] Plaintiff's Exhibit 178 at 004493, *Plaintiff's Trial Brief* [DE # 203] at 5.  Wells Fargo received the January 21, 2016 Request by mail on January 24, 2016.  Plaintiff's Exhibit 178 at 004551.

[57] Plaintiff's Exhibit 178 at 004553; *Transcript of Hearing Held June 30, 2021* [DE # 278] at 18:4-21:4.  Thomas Connop received the March 17, 2016 Request by email on behalf of Wells Fargo on March 17, 2016.  Plaintiff's Exhibit 181 at 004790.  Wells Fargo received the March 17, 2016 Request by mail on March 21, 2016.  Plaintiff's Exhibit 178 at 004561.

| | | | | |
|---|---|---|---|---|
| | A DDCH screenshot.<br><br>A PL05 screenshot.<br><br>A HAZ1 screenshot.<br><br>Records relating to tax and other escrow disbursements. | 05/10/2016 | PE-181 004842 | An email from Locke Lord providing redacted, combined notes for the missing time period. |
| 06/02/2016[58] | The "June 2, 2016 Request"<br><br>Notice of Error: A letter with a returned check from a different borrower and loan was erroneously sent to the Debtor causing her stress regarding ASC's practices. The letter said that the Debtor would need to make payments in certified funds.<br><br>A notice of correction. | 06/09/2016 | PE-179 004613 | A letter from Locke Lord acknowledging the receipt of the request for information. |
| | | 07/14/2016 | PE-179 004614 | An update letter from Locke Lord informing the Debtor that Wells Fargo needs 15 more days to respond. |
| | | 08/04/2016 | PE-180 004699 | A letter from Locke Lord confirming that the letter and check were sent in error. "Ms. Neria's account is not currently required to submit mortgage payments in certified funds, and such a restriction was never placed on her account. Thus, no correction to the account is necessary." |
| Servicing transferred to Specialized Loan Servicing on December 1, 2018. | | | | |
| 12/04/2018[59] | The "December 4, 2018 Request"<br><br>A letter to Wells Fargo requesting the following information as of December 1, 2018 (the date of the transfer of servicing):<br><br>(a) A reinstatement quote;<br><br>(b) An itemized reinstatement quote;<br><br>(c) A reinstatement quote for the time that service was transferred to Specialized Loan Servicing;<br><br>(d) An itemized statement of all fees, charges, and other amounts assessed to the mortgage loan account prior to its transfer to Specialized Loan Servicing. | 12/10/2018 | PE-179 004616 | A letter from Sean Smith acknowledging the request for information and indicating that Wells Fargo will respond by December 24, 2018. |
| | | 12/21/2018 | PE-180 004702 | A letter from Locke Lord stating that Wells Fargo is unable to provide reinstatement quotes for dates that have already passed. The letter enclosed Wells Fargo's last statement to the Debtor dated November 16, 2018, showing:<br><br>• Post-petition principal, interest, and escrow;<br><br>• Unpaid principal, unpaid advance balance, unapplied funds balance, and the escrow balance;<br><br>• An insurance disbursement.<br><br>The letter also stated that the only charge on the Debtor's account was an advance for a title policy cost of |

---

[58] Plaintiff's Exhibit 178 at 004563; *Transcript of Hearing Held June 30, 2021* [DE # 278] at 25:2-26:13. Wells Fargo received the June 2, 2016 Request by mail on June 7, 2016, and counsel for Wells Fargo acknowledged receipt of the request in a letter dated June 9, 2016. Plaintiff's Exhibit 178 at 004571; *Joint Pretrial Order* [DE # 270] at 23.

[59] Plaintiff's Exhibit 178 at 004573. Wells Fargo received the December 4, 2018 Request by mail on December 10, 2018. Plaintiff's Exhibit 178 at 004578.

| | | | | |
|---|---|---|---|---|
| | | | | $225.00 which was assessed on June 27, 2014. |
| 01/10/2019[60] | The "January 10, 2019 Request"<br><br>The January 10, 2019 Request was identical to the December 4, 2018 Request. | 01/16/2019 | PE-180 004713 | A letter from Wells Fargo providing an identical response to the letter from Locke Lord dated December 21, 2018. |
| 02/11/2019[61] | The "February 11, 2019 Request"<br><br>A letter to Wells Fargo requesting:<br><br>(a) An explanation of how Wells Fargo complied with regulations when it facilitated the transfer of information during the transfer of servicing;<br><br>(b) An explanation of how Wells Fargo complied with regulations regarding its record retention and the maintenance of documents:<br><br>(c) The entire servicing file for the Debtor's loan at the time of transfer, including:<br><br>• A schedule of all credits and debits to the account;<br><br>• A copy of the security instrument;<br><br>• Any notes created by institution personnel;<br><br>• A report of the data fields relating to the Debtor's account created by the institution's electronic systems;<br><br>• Copies of any information of documents provided | 02/15/2019 | PE-179 004617 | A letter from Amy Wachter acknowledging the request for information and indicating that Wells Fargo will respond by March 4, 2019. |
| | | 03/04/2019 | PE-179 004620 | An update letter from Terri Stone. Stating that Wells Fargo will respond by March 18, 2019. |
| | | 03/11/2019 | PE-180 004715 | A letter from Terri Stone stating that Wells Fargo is unable to provide a reinstatement quote for this account prior to the service transfer completed on December 1, 2018.<br><br>The letter provided:<br><br>(a) the Note and Security Instrument;<br>(b) the name and contact information of the owner prior to transferring servicing, BSABS I 2006-HE4 (Wilmington Trust, National Association);<br>(c) an account history.<br><br>Wells Fargo further indicated that it was unable to provide anything else because the request was too broad. |

---

[60] Plaintiff's Exhibit 178 at 004581, *Plaintiff's Post-Trial Brief* [DE # 284] at 13. Wells Fargo received the January 10, 2019 Request by mail on January 14, 2019. Plaintiff's Exhibit 178 at 004586.

[61] Plaintiff's Exhibit 178 at 004589. The court is unable to discern the date that Wells Fargo received the February 11, 2019 Request. However, Wells Fargo acknowledged receipt within four business days, and it substantively responded within 19 business days at the latest.

| | | | | |
|---|---|---|---|---|
| | by the Debtor to the institution in connection with written error notices or loss mitigation. | | | |
| 02/11/2019[62] | The "February 11, 2019 Notice of Error"<br><br>Notice of Error: A letter to Wells Fargo informing it of its failure to provide the information requested in the January 10, 2019 Request. Specifically, Wells Fargo failed to provide a reinstatement quote for the time that service was transferred to Specialized Loan Servicing<br><br>The Debtor stated that Wells Fargo had the information she requested and that her request was reasonable. | | | |

---

[62] Plaintiff's Exhibit 178 at 004597.  Wells Fargo appears to have responded to the February 11, 2019 Request and the February 11, 2019 Notice of Error as if they were a single request.  The court is unable to discern the date that Wells Fargo received February 11, 2019 Notice of Error.  However, Wells Fargo acknowledged receipt within four business days, and it substantively responded within 19 business days at the latest.

The court addresses in the Conclusions of Law Section below whether, based on the above compilation of evidence, Wells Fargo committed any actionable RESPA violations.

### F. Credibility Assessment of Wells Fargo's Witnesses

The testimony from the Wells Fargo employees seemed generally credible, and the witnesses seemed like pleasant people.  However, their testimony was full of "I don't know" answers, and they struggled to explain matters clearly.  They spoke in acronyms and referred to automated functions such as "GEM," "Browse," "MSP Screens," "Bankruptcy Work Stations," "MOBIAS," "CASH."   Some did not know what a proof of claim or a Rule 3002.1 Payment Change Notice was, despite being "Bankruptcy Processors" at Wells Fargo.[63]   The former "Director of Bankruptcy Operations" (a Senior Vice President) during relevant times of this case, had no college degree and seemed to have little knowledge about payment application processes.[64] She did not know escrow rules.  She did not know what a suspense account is in the mortgage servicing space.  She did not know the difference between a dismissal of a bankruptcy case and a discharge.  She did not know what the *Green* case had held.

## IV. CONCLUSIONS OF LAW

### A. Does the Debtor Have a Valid Cause of Action for Breach of Contract on Which She May Obtain Relief?

In addressing the Debtor's cause of action that Wells Fargo committed breach of contract by misapplying payments, the court will start by setting forth some basic principles of contract law.

In Texas, the elements of a breach of contract claim include: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the

---

[63] *See* Plaintiff's Exhibits 69 and 78.
[64] *See* Plaintiff's Exhibit 79.

defendants; and (4) damages sustained by the plaintiff as a result of the breach."[65]   The Debtor

bears the burden to prove each element by a preponderance of the evidence.

It is undisputed that a valid contract existed here (the contracts being loan documents and

then Chapter 13 plans). But did the element of "performance or tendered performance by the

plaintiff" exist here?  This is somewhat complicated because, when a plaintiff is herself in default

on a contract, due to her own failure to perform, she generally may not assert a claim for a

defendant's breach of that contract **unless** her own breach is not material. "Generally, one party's

breach does not excuse the other's performance unless the breach is material."[66]   The following

five factors determine whether a failure to perform is material:

> (1) the extent to which the party that has been injured will be deprived of his reasonably
> expected benefit;
>
> (2) the extent to which this injured party can be compensated adequately for the breach;
>
> (3) the extent to which the non-performing party will suffer forfeiture;
>
> (4) the likelihood of a cure by the breaching party, accounting for all of the circumstances
> including any reasonable assurances; and
>
> (5) the extent that the breaching party's behavior comports with standards of good faith
> and fair dealing.[67]

"The less the non-breaching party is deprived of the expected benefit, the less material the

breach."[68]   If the plaintiff is a Chapter 13 debtor who—despite previous breaches—is now

performing under a confirmed plan, the court must weigh that performance in its analysis of

whether the plaintiff-debtor is in material breach herself.[69]   Where a debtor, in good faith, files for

---

[65] *Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 465 (5th Cir. 2003); *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007); *Winston Acquisition Corp. v. Blue Valley Apts., Inc.*, 436 S.W.3d 423, 429 (Tex. App.—Dallas 2014, no pet.).
[66] *Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 755 (Tex.2013) (citing Restatement (Second) of Contracts § 237 (1981).
[67] *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 n. 2 (Tex.1994) (citing Restatement (Second) of Contracts § 241 (1981)); *see also In re Trevino*, 535 B.R. 110, 155 (Bankr. S.D. Tex. 2015).
[68] *Hernandez,* 875 S.W.2d at 693.
[69] *In re Trevino*, 535 B.R. 110, 156 (Bankr. S.D. Tex. 2015).

bankruptcy, confirms a plan, and thereafter performs under that plan such that the creditor in all likelihood will be made whole through the cure, the debtor's breach from that time on would no longer be material.[70]

The Debtor here was, without a doubt, in material default of her mortgage loan when she filed the 2011 Bankruptcy, due to lack of payment. She had fallen behind on her payments at various points between the years 2006 and 2009, and she made only one payment in the years 2010 and 2011.[71] Moreover, the 2011 Bankruptcy was dismissed pursuant to General Order 2010-01 for failure to make plan payments.[72] The evidence does not show by a preponderance of the evidence that the Debtor regularly and properly made her plan payments during the 2011 Bankruptcy. Therefore, the Debtor failed to show that she was ***not*** in material breach under the Plan or the Security Instrument up through the period that preceded the 2014 Bankruptcy. Accordingly, she cannot maintain a cause of action for breach of contract prior to the filing of the 2014 Bankruptcy. On the contrary, the parties agree that the Debtor paid her plan payments and completed her plan in the 2014 Bankruptcy. Therefore, she was not in material breach and is able to pursue a breach of contract claim for any breaches of contract by Wells Fargo during the 2014 Bankruptcy.

But was there a breach of contract by Wells Fargo during the 2014 Bankruptcy and were there damages sustained by the Debtor as a result of the breach?

Upon confirmation, the bankruptcy plan constitutes the new contract between the debtor and the creditor.[73] After confirmation, the debtor cannot assert an independent breach of contract

---

[70] *In re Trevino*, 535 B.R. 110, 156 (Bankr. S.D. Tex. 2015).
[71] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 91:5-92:18; Defendant's Exhibit 86.
[72] Defendant's Exhibit 12.
[73] *In re Padilla*, 379 B.R. 643, 663 (Bankr. S.D. Tex. 2007) (citing *In re Stratford of Tex., Inc.*, 635 F.2d 365, 368 (5th Cir.1981)); *In re Hamilton-Simmons*, No. 08-34897-SGJ-13, 2009 WL 2778293, at *4 (Bankr. N.D. Tex. Aug. 31, 2009) (citing *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1986).

claim for conduct that is subsumed by the plan. "The breach of contract theory cannot stand as a separate cause of action."[74]

Here, the Debtor has not asserted a claim for breach of the ***confirmed plan***. Instead, the Debtor alleges that Wells Fargo breached the Security Instrument's provisions with regard to Wells Fargo's application of payments in two ways. First, Wells Fargo deposited payments in an "unapplied" account before applying them to principal, interest, and escrow. Second, Wells Fargo collected "Trustee Interest" (*i.e.*, the post-petition interest on pre-petition arrearage) and failed to apply it to the Debtor's account, as required contractually, even after the dismissal of the 2011 Bankruptcy.[75] With regard to the Debtor's latter argument, it does have some logic, because, upon dismissal of a bankruptcy case, as opposed to a discharge, the parties are generally required to be returned to the positions that they were in before the case was initiated.[76] The reasoning behind this return to the status quo ante is "when a debtor fails to fulfill [her] end of the bargain because of the dismissal of their case, a resulting finding that their confirmed Chapter 13 plan is terminated serves to prevent a debtor from obtaining the benefit of those terms in a plan which are advantageous to the debtor."[77] In other words, the parties are returned to the status quo ante in order to prevent a debtor from taking advantage of her own plan defaults.[78]

However, on balance, the misapplications of payments alleged to have been committed by Wells Fargo here do not fit within the category of breach of contract. The court does not believe that the Debtor (because of her earlier material breaches) would be able to advance a cause of action for breach of contract until the 2014 Bankruptcy when she was on track performing under

---

[74] *In re Rodriguez*, 421 B.R. 356, 381 (Bankr. S.D. Tex. 2009).
[75] *See Plaintiff's Original Complaint* [DE # 1] at 42-43.
[76] *In re Oparaji*, 698 F.3d 231, 237 (5th Cir. 2012).
[77] *Id.* at 238 (quotation omitted).
[78] *See id.*

a plan in that case. And the court further concludes that Wells Fargo's receipt and retention of post-petition interest on pre-petition arrearages (without sending them to the mortgage holder)— during both the 2011 and 2014 bankruptcy cases—were possibly a breach of the servicing agreement between Wells Fargo and Wilmington, but the Debtor is not privy to that agreement. As later explained, the court believes that an automatic stay violation occurred here, but not a breach of contract (of either the Debtor's loan documents or the plans in the 2014 Bankruptcy). The court also concludes that the various escrow and accounting errors – while implicating Section 362(a)(3) and Bankruptcy Rule 3002.1 – do not rise to the level of an actionable breach of contract here.

## B. Were There RESPA Violations that Entitle the Debtor to Relief?

The court now addresses whether Wells Fargo is liable to the Debtor for RESPA violations.

What is the Real Estate Settlement Procedures Act ("RESPA")? RESPA is a federal statute that is intended to effect certain changes in the settlement process for residential real estate that will result (1) in more effective advance disclosure to home buyers and sellers of settlement costs; (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services; (3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and (4) in significant reform and modernization of local recordkeeping of land title information.[79] Pertinent here, RESPA requires a servicer of federally related mortgage loans to respond to any "qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan."[80]

## (i) Qualified Written Requests Under RESPA Section 2605(e)

---

[79] 12 U.S.C. § 2601(b).
[80] 12 U.S.C. § 2605(e)(1)(A).

For a communication to constitute a "qualified written request" (a "QWR"), the borrower's correspondence must enable the servicer to identify the name of and account of the borrower and include either a statement of the reasons for a borrower's belief that his account may be in error or provide sufficient detail to the servicer regarding the information sought.[81]  A general request for "all information" relating to the servicing of a loan[82] and "rambling, repetitive, … inquisition[s] posing discovery-style document demands and interrogatories"[83] do not qualify as QWRs. RESPA's statutory requirements are not demanding, but they must be satisfied for RESPA to apply.

To qualify as QWRs, each of the Debtor's nine requests for information must have first enabled the servicer to identify the name and account of the borrower.[84]  Each of the nine letters included the Debtor's name, the last four digits of the loan number, and the property address. Therefore, each request satisfied the first condition of a QWR under RESPA.

Additionally, to be QWRs, Section 2605(e)(1)(B) requires that the requests for information include either a statement of the reasons for the borrower's belief that the account is in error or provide sufficient detail to the servicer regarding the information sought.[85]  Eight of the nine requests met one or both requirements.  The court refers back to the chart earlier set forth herein describing all the purported QWRs and responses.

Turning to the first half of Section 2605(e)(1)(B), the June 2, 2016 Request and the February 11, 2019 Notice of Error included statements of the reasons that the Debtor believed that

---

[81] 12 U.S.C. § 2605(e)(1)(B).
[82] *Foster v. Bank of New York Mellon*, No. 4:17-CV-319-ALM-CAN, 2018 WL 2993564, at *5 (E.D. Tex. May 10, 2018), *report and recommendation adopted*, No. 4:17-CV-319, 2018 WL 2981340 (E.D. Tex. June 13, 2018) (citing cases).
[83] *Hollenshead v. Bank of Am., N.A.*, No. 418CV00724ALMCAN, 2020 WL 4615096, at *7 (E.D. Tex. May 19, 2020), *report and recommendation adopted,* No. 4:18-CV-724, 2020 WL 3496335 (E.D. Tex. June 29, 2020) (internal quotations omitted).
[84] 12 U.S.C. § 2605(e)(1)(A).
[85] 12 U.S.C. § 2605(e)(1)(B).

her account was in error.  The June 2, 2016 Request stated that the Debtor received a letter with an enclosed check that did not belong to her.  The patently incorrect information formed the basis of the Debtor's belief that Wells Fargo made an error.  The February 11, 2019 Notice of Error included the Debtor's reasons why she believed Wells Fargo erroneously withheld information about the Debtor's account.  The Debtor believed that Wells Fargo had access to the information that she requested, and Wells Fargo's policy preventing the disclosure of that information constituted an error.  For these reasons, the June 2, 2016 Request and the February 11, 2019 Notice of Error qualified as QWRs under RESPA Section 2605(e)(1).

Turning to the second half of Section 2605(e)(1)(B), requests for information also qualify as QWRs if they provide sufficient detail to the servicer regarding the information the borrower seeks.[86]  All of the requests except for the December 15, 2015 Request provided sufficient detail of the information that the Debtor requested from Wells Fargo.  Examples include but are not limited to the following:

(i)     an itemized payoff balance and information about the mortgage owner (the October 12, 2015 Request);

(ii)    a reinstatement quote (the January 21, 2016 Request);

(iii)   a copy of all NOTS servicing notes (the March 17, 2016 Request);

(iv)    an itemized reinstatement quote from the time Wells Fargo transferred the loan to Specialized Loan Servicing (the December 4, 2018 Request);

(v)     an itemized statement of all fees, charges, and other amounts assets to the account prior to its transfer (the January 10, 2019 Request); and

(vi)    a report of data fields relating to the Debtor's account created by the institution's electronic system (the February 11, 2019 Request).

---

[86] 12 U.S.C. § 2605(e)(1)(B).

None of the Debtor's letters rose to the level of mere generic requests for all information relating to the servicing of the loan or rambling discovery requests.[87]   Therefore, they satisfied the second half of Section 2605(e)(1)(B).

The December 15, 2015 Request was a notice of error stating that the Debtor had received no response to her request dated October 12, 2015.  The notice failed to request any document or specific information, and it did not include express reasoning why the Debtor believed the servicing of her account was in error.  Absent a request or reason for error, the December 15, 2015 Request did not qualify as a QWR under Section 2605(e)(1)(B).  Taken together, all other requests for information satisfied both Sections 2605(e)(1)(A) and 2605(e)(1)(B).  Therefore, they were QWRs under RESPA, and Wells Fargo was required to respond in a certain way by a certain time.

**(ii) Wells Fargo's Responses to the Qualified Written Requests**

Having determined that eight of the Debtor's nine requests for information were QWRs under RESPA, the court will now turn to Wells Fargo's responses to the requests.  Within five business days of receiving a QWR, the servicer must respond, in writing, acknowledging receipt of the request.[88]   Section 2605(e)(2) sets forth three ways in which a servicer may substantively respond to a QWR.  First, the servicer can make corrections to the account.[89]   Second, it can, after an investigation, explain or clarify why the account is already correct.[90]   Third, the servicer can, after an investigation, provide the borrower with a written explanation or clarification that includes the requested information or an explanation of why the requested information cannot be obtained.[91]

---

[87] *See Foster v. Bank of New York Mellon*, No. 4:17-CV-319-ALM-CAN, 2018 WL 2993564, at *5 (E.D. Tex. May 10, 2018), *report and recommendation adopted*, No. 4:17-CV-319, 2018 WL 2981340 (E.D. Tex. June 13, 2018) (citing cases) *and Hollenshead v. Bank of Am., N.A.*, No. 4:18-CV-00724-ALM-CAN, 2020 WL 4615096, at *7 (E.D. Tex. May 19, 2020), *report and recommendation adopted,* No. 4:18-CV-724, 2020 WL 3496335 (E.D. Tex. June 29, 2020) (internal quotations omitted).
[88] 12 U.S.C. § 2605(e)(1)(A).
[89] 12 U.S.C. § 2605(c)(2)(A).
[90] 12 U.S.C. § 2605(e)(2)(B).
[91] 12 U.S.C. § 2605(e)(2)(C).

"The disjunctive phrasing of 12 U.S.C. § 2605(e)(2) means that there are three ways in which a servicer can validly respond to a QWR and a servicer need not satisfy all three."[92]  Either way, the servicer must respond no later than 30 days (excluding legal public holidays, Saturdays, and Sundays) from receipt of the qualified written request.[93]  The servicer may extend the time to respond by 15 days if it notifies the borrower of the delay and the reasons for the delay within the original 30-day period.[94]

As noted above, a sufficient response to a QWR must be timely and substantively answer the request.  Turning first to timeliness, Wells Fargo was required to acknowledge receipt of the Debtor's QWRs in writing within five business days of receiving the requests, which it timely did. It responded to the October 12, 2015 Request, the January 21, 2016 Request, and the December 4, 2018 Request the same day it received them.[95]  It responded to the March 17, 2016 Request in one day,[96] and the June 2, 2016 Request and January 10, 2019 Request in two days.[97]  The court is unable to determine when Wells Fargo received the February 11, 2019 QWRs, but the evidence shows that Wells Fargo acknowledged their receipt on February 15, 2019, which is within five business days of February 11, 2019.[98]  Wells Fargo timely acknowledged all of the Debtor's QWRs.  Next, Wells Fargo was required to substantively respond within 30 business days of its receipt of the QWRs (or within 45 days if it notified the Debtor of the delay and the reasons for the delay within the original 30-day period).  Wells Fargo satisfies the timeliness requirement for each QWR except for the January 21, 2016 Request and the March 17, 2016 Request.

---

[92] *Hittle v. Residential Funding Corp.*, No. 2:13-CV-353, 2014 WL 3845802, at *8 (S.D. Ohio Aug. 5, 2014).
[93] 12 U.S.C. § 2605(e)(2).
[94] 12 U.S.C § 2605(e)(4).
[95] Plaintiff's Exhibit 178 at 004479, 004551, and 004578; Plaintiff's Exhibit 179 at 004604, 004609 and 004616. Wells Fargo received the January 21, 2016 Request on a Sunday, and it responded the following Monday.
[96] Plaintiff's Exhibit 178 at 004561; Plaintiff's Exhibit 179 at 004612.
[97] Plaintiff's Exhibit 178 at 004571 and 004586; Plaintiff's Exhibit 179 at 004613; Plaintiff's Exhibit 180 at 004713.
[98] Plaintiff's Exhibit 179 at 004617.

| The Date of the QWR | The Date Wells Fargo Received the QWR | 30 Business Days from the Date of Receipt | 45 Business Days from the Date of Receipt | The Date of Wells Fargo's Final Response |
|---|---|---|---|---|
| 10/12/2015 | 10/16/2015 | 12/01/2015 | 12/22/2015 | 11/16/2015 |
| 01/21/2016 | 01/24/2016 | 03/08/2016 | 03/29/2016 | 03/21/2016 |
| 03/17/2016 | 03/17/2016 | 04/28/2016 | 05/19/2016 | 05/10/2016 |
| 06/02/2016 | 06/07/2016 | 07/20/2016 | 08/10/2016 | 08/04/2016 |
| 12/04/2018 | 12/10/2018 | 01/24/2019 | 02/14/2019 | 12/21/2018 |
| 01/10/2019 | 01/14/2019 | 02/27/2019 | 03/20/2019 | 01/16/2019 |
| 02/11/2019 | 02/11/2019 | 03/26/2019 | 04/16/2019 | 03/11/2019 |

As the table indicates, Wells Fargo responded to most of the Debtor's QWRs within the 30-day response window. Three of Wells Fargo's responses fall between the 30 and 45-day windows: responses to the January 21, 2016 Request, the March 17, 2016 Request, and the June 2, 2016 Request. The timeliness of those responses depends on whether Wells Fargo satisfied 12 U.S.C § 2605(e)(4) by notifying the Debtor of the delay and the reasons for the delay. Wells Fargo complied with Section 2605(e)(4) (and therefore extended its allowed response time) for the March 17, 2016 Request but not for the January 21, 2016 Request or the June 2, 2016 Request. Hence, Wells Fargo's response to the January 21, 2016 Request (dated March 21, 2016) was untimely, as was its response to the June 2, 2016 Request (dated August 4, 2016).[99]

Looking first at the March 17, 2016 Request, Wells Fargo sent an email to the Debtor on April 18, 2016. That email contained incomplete information, but it notified the Debtor of the missing information and stated that a request had been entered to retrieve it from archives. In doing so, Wells Fargo notified the Debtor that there was a delay, the reason for the delay, and what

---

[99] Plaintiff's Exhibit 180 at 004695 and 008699.

Wells Fargo was doing to remedy it.  The rest of Wells Fargo's response came via email on May 10, 2016, which was within the 45-day window.[100]  Thus, its response was timely.

Turning next to the January 21, 2016 Request, Wells Fargo sent the Debtor two "update" letters in the 30-day window regarding its delayed response, but both letters failed to provide a reason for the delay.[101]  They appeared to come from a form that read: "It was our goal to respond with our results by [date].  We now expect to complete our work by [date].  We appreciate your patience as we finalize our research."  The form responses also provided the name and contact of an individual the borrower could call with any questions, but they did not explain why there was a delay in the first place.  Therefore, the response did not satisfy Section 2605(e)(4) and was untimely.

Finally, in response to the June 2, 2016 Request, Wells Fargo sent the Debtor a letter dated July 14, 2016, informing her that Wells Fargo needed 15 more days to respond to her request.[102]  The letter stated that Wells Fargo "required additional time to fully investigate the issues" but it did not provide a reason why there was a delay as required by Section 2605(e)(4).  Hence, Wells Fargo failed to extend the response deadline past 30 days.  The August 4, 2016 letter was, therefore, untimely as well.

In terms of the ***substance*** of Wells Fargo's responses, the documentary evidence and trial testimony show that Wells Fargo provided most of the information that the Debtor requested except for a few exceptions, the most notable of which was the failure to produce a reinstatement quote for the period that it serviced the loan.  At least five of the Debtor's QWRs addressed a reinstatement quote.  Wells Fargo first responded by saying that one would be provided after it

---

[100] Plaintiff's Exhibit 181 at 004842.
[101] Plaintiff's Exhibit 179 at 004610 and 004611.
[102] Plaintiff's Exhibit 179 at 004614.

filed a proof of claim (even though a proof of claim had long since been filed). On another occasion, it informed the Debtor that it would not provide reinstatement information on account of a litigation exception (which appears to lack supporting legal authority). Additionally, absent from the admitted exhibits is evidence that shows Wells Fargo responded to the Debtor's request for four screenshots: P309, FEEI, DDCH, and HAZ1 screenshots. Otherwise, as shown in the table included in the Court's Additional Findings of Fact, Wells Fargo timely responded to the Debtor's requests with account histories, payoff information, and account notes. In response to other requests, Wells Fargo indicated that it had investigated the Debtor's requests and indicated that either the account was not in error or explained why the information sought could not be provided.

Although the evidence, in total, might reasonably be described as less-than-robust responses to each of the QWRs on Wells Fargo's part, there was – significantly – no evidence of a causal connection between the RESPA correspondences and any damages that the Debtor may have suffered. As described in greater detail below, Section 2605(f) of RESPA allows the recovery of damages *caused* by the failure to comply. Here, that causal connection is missing.

**(iii) Requests for Information Under RESPA Section 2605(k)**

Turning now to RESPA § 2605(k)(1), it provides that a servicer of a federally related mortgage loan shall not: (1) fail to take timely action to respond to a borrower's request to correct errors relating to payment allocation, payoff balances, avoiding foreclosure, or other standard servicer duties; (2) fail to respond within ten business days to a request for the identity and address of the owner or assignee of the loan; or (3) fail to comply with any other obligation found by the

Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of RESPA.[103]

Sections 2605(k)(1)(C) and (D) are at issue here. Section 2605(k)(1)(C) requires less in some respects than § 2605(e). Wells Fargo only needed to have timely acted in response to the Debtor's request to correct an error. The evidence indicates that it did.[104] "That is, defendant *actually responded* to [the plaintiff's] letter and that is all that that subsection of RESPA apparently requires."[105] The Debtor's Exhibit 179 is a collection of Wells Fargo's acknowledgments of receipt to the Debtor's requests for information. It and the contents of the Debtor's Exhibit 180 show that Wells Fargo responded and followed up to the Debtor's requests in satisfaction of § 2605(k)(1)(C). As for Section 2605(k)(1)(D), it required Wells Fargo to, within ten business days, provide the identity and address of the owner or assignee of the loan. The October 12, 2015 Request and March 17, 2016 Request requested the identity and contact information of the mortgage loan owner. Wells Fargo acknowledged receipt of both requests. It provided the requested identity and contact information within 20 days of the first request (*i.e.,* untimely) and within five days of the second (*i.e.*, timely). Thus, Wells Fargo violated Section 2605(k)(1)(D) *only* with regard to the October 12, 2015 Request. However, as discussed in greater detail below, the absence of any evidence of a causal connection between this violation and any actual damages precludes any damages recovery.[106]

**(iv) Damages Under RESPA**

---

[103] 12 U.S.C. § 2605(k)(1)(C)-(E).

[104] Plaintiff's Exhibit 179.

[105] *Christenson v. CitiMortgage, Inc.*, 255 F. Supp. 3d 1099, 1106 (D. Colo. 2017); *Carmichael v. Saxon Mortg. Servs., Inc.*, 2:11–CV–1110–MEF, 2013 WL 4786120, at *3 (M.D. Ala. Sept. 6, 2013) (denying summary judgment on a § 2605(e) claim where the evidence showed that upon receiving a fax that qualified as a QWR that the servicer merely acknowledged receipt and then failed to subsequently respond ever again).

[106] *Hock Huat Yap v. Deutsche Bank Nat'l Tr. Co.*, No. CV-17-00229-TUC-RM, 2018 WL 4095167, at *6 (D. Ariz. Aug. 28, 2018) (denying the borrower's motion for summary judgment because of an absence of factual allegations connecting a violation of Section 2605(k)(1)(D)).

A loan servicer that fails to comply with Section 2605 is liable to an individual borrower for "any actual damages to the borrower as a result of the failure," and additional statutory damages "in the case of a pattern or practice of noncompliance."[107]   In addition to actual damages and statutory damages, a borrower, if successful on her Section 2605 claim, may also recover "the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances."[108]   Borrowers cannot be awarded statutory damages or attorneys' fees ***without first recovering actual damages*** because "[f]or RESPA's statutory damages to be 'additional,' there must be other damages to which they are added."[109]   Furthermore, "[a]ttorneys' fees and litigation expenses cannot satisfy the actual damages requirement of a RESPA claim" because RESPA expressly recognizes attorneys' fees separately from actual damages.[110]

To recover under Section 2605 of RESPA, the Debtor bears the burden to show, by a preponderance of the evidence, that she suffered actual damage resulting from Wells Fargo's failure to properly respond to one or more valid QWRs.  The words "as a result of" dictate the need for a causal link between the violation and the damages.[111]   Thus, general damages resulting

---

[107] 12 U.S.C. § 2605(f)(1).

[108] 12 U.S.C.  § 2605(f)(3).

[109] *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 720 (8th Cir. 2018) (cited in *Wilson v. Deutsche Bank Tr. Co. Americas as Tr. for Residential Accredit Loans, Inc., Mortg. Asset-Backed Pass-Through Certificates, Series 2006-QS5*, No. 3:18-CV-0854-D, 2020 WL 3452298 (N.D. Tex. June 24, 2020)).

[110] *Anderson v. Wells Fargo Bank, N.A.*, No. 3:16-CV-2514-N, 2018 WL 3426269, at *10 (N.D. Tex. July 13, 2018) (citing *Whittier v. Ocwen Loan Servicing, L.L.C.*, 594 Fed.Appx. 833, 836–37 (5th Cir. 2014) and *Steele v. Quantum Servicing Corp.*, No. 3:12-CV-2897-L, 2013 WL 3196544, at *6 (N.D. Tex. June 25, 2013)).  The court acknowledges that limited language in *Anderson* suggests attorney's fees separate from the RESPA litigation could be considered actual damages, or they could at least raise an issue of fact to enable a borrower to survive summary judgment.  The analysis in *Anderson* lacked a detailed discussion of attorneys' fees and instead focused on emotional distress damages.  Furthermore, the language in *Anderson* is outweighed by more authoritative and explicit case law from the Fifth Circuit and the plain language of Section 2605(f)(3).  In the present case, Plaintiff's Exhibit 190 lists attorney's fees incurred by Debtor's counsel through March 15, 2017.  However, these fees fail to qualify as independent actual damages because the timesheets demonstrate that they were incurred in preparation of this litigation.  Therefore, they are not separate from the attorneys' fees addressed in Section 2605(f)(3).

[111] *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 719 (8th Cir. 2018); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016).

from the bankruptcy process or litigation are not sufficient to satisfy Section 2605's specific requirements. In other words, failure to show actual damages that result from responses to information requests will preclude recovery. The court finds that the Debtor failed to show a causal link between Wells Fargo's RESPA responses and any damages she may have incurred. Hence, she did not meet her burden as to Section 2605 of RESPA.

To start, the Debtor's complaint and pleadings fail to expressly link any harm the Debtor suffered to Wells Fargo's failure to respond to requests for information. The evidence offered little help. The bulk of the trial testimony regarding damages addressed the Debtor's emotional distress and the state of disrepair of the Debtor's house (the suggestion being that, if the Debtor had some of the money that Wells Fargo was wrongfully withholding or misapplying, she might have applied it to badly needed maintenance on her house). While both types of damages could conceivably be actual damages under RESPA,[112] the testimony did not establish that they were related to Wells Fargo's responses to qualified written requests. The connection to Wells Fargo's responses to requests for information is unclear and attenuated at best.

The closest connection between Wells Fargo's responses and damages identified in the testimony was from a comment made by the Debtor's mother, Ms. Salazar. At some time in either 2016 or 2017, Ms. Salazar spoke with an attorney from the Debtor's substitute counsel, at Kellett & Bartholow PLLC. Ms. Salazar stated that she was shocked to hear from Ms. Megan Clontz that Wells Fargo would not answer the QWRs.[113] That conversation made Ms. Salazar question whether Kellett & Bartholow PLLC was giving her and the Debtor "the runaround."[114] Her reservations did not relate to the injuries that comprised the bulk of Ms. Salazar's testimony: the

---

[112] See Anderson, 2018 WL 3426269 at *11.
[113] Transcript of Hearing Held June 30, 2021 [DE # 278] at 71:23-72:3.
[114] Id. at 72:1-2.

Debtor's mental distress and the disrepair of the house.  Ms. Salazar testified that the need to make mortgage payments left her and the Debtor unable to afford repairs.[115]  As a result, the house was "falling apart" and needed an estimated $37,825 of repair work.[116]  Additionally, Ms. Salazar and the Debtor both testified as to the general mental state of the Debtor after dealing with Wells Fargo through the bankruptcy process.[117]  However, the testimony lacked a causal connection to Wells Fargo's ***failure to adequately respond to the Debtor's QWRs***.

In summary, Debtor's counsel argued that a proper accounting of the Debtor's loan could have saved trouble, expense, and stress.  But that statement lacks sufficient evidentiary support required by the plain language of Section 2605(f) of RESPA.  As stated above, absent a showing of actual damages, the court cannot award statutory damages or attorney's fees.  For that reason, the court denies the relief sought under Section 2605 of RESPA.

### C.  Were There FDCPA Violations that Entitle the Debtor to Relief?

The Debtor has also sought to impose liability upon Wells Fargo under the Fair Debt Collection Practices Act (the "FDCPA").[118]  The FDCPA imposes civil liability on debt collectors for certain prohibited debt collection practices.  The purpose of the FDCPA is to protect consumers by eliminating "abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."[119]  The FDCPA is a remedial statute, and therefore must be construed liberally in favor of the Debtor.[120]

---

[115] *Id*. at 77:16-21.
[116] *Id*. at 77:8-15 and 99:4; Plaintiff's Exhibit 84.
[117] *Transcript of Hearing Held June 30, 2021* [DE # 278] at 70:15-25 and 136:19-137:10.
[118] The Fair Debt Collection Practices Act found at 15 U.S.C. § 1692.
[119] 15 U.S.C. § 1692(e); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 577, 130 S. Ct. 1605, 1608, 176 L. Ed. 2d 519 (2010).
[120] *Serna v. Law Office of Joseph Onwuteaka, P.C.*, 732 F.3d 440, 445 (5th Cir. 2013) (quoting *Johnson v. Riddle*, 305 F.3d 1107 (10th Cir. 2002)).

It is also a strict liability statute, which provides for actual and statutory damages upon the showing of a single violation.[121] Because the FDCPA imposes strict liability, there is no requirement that the actions taken by a debt collector "be intentional or actionable."[122]  To prevail on an FDCPA claim, a plaintiff must prove "(1) [she] has been the object of collection activity arising from a consumer debt; (2) the defendant is a debt collector defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA."[123]

Ticking through the elements, a "consumer debt" is easily established here, in that the Debtor in her individual capacity is obligated to pay the indebtedness represented by the Note and Security Instrument, and the loan was taken out to refinance the Debtor's home.[124]

Additionally, Wells Fargo is a "debt collector" because it acquired servicing of the Debtor's mortgage loan account while the account was in default.[125]

Less clear is whether Wells Fargo's allegedly wrongful conduct here was "collection activity" at all.  "[T]here is no clear statutory definition of a collection activity."[126]  An array of actions can be considered collection activities.  A common example is a letter that states a consumer "must pay, a date by when he must pay, to whom he must pay his debt, the consequences of not paying, or any other information associated with a communication intended to collect a debt."[127]  The easiest was to analyze the "collection activity" question is to consider Wells Fargo's

---

[121] *Eastman v. Baker Recovery Services (In re Eastman)*, 419 B.R. 711, 733 (Bankr. W.D. Tex. 2009); *see also Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1238 (5th Cir. 1997).
[122] *Eastman*, 419 B.R. at 728 (citing *Pittman v. J.J. Mac Intyre Co*., 969 F. Supp. 609, 613 (D. Nev. 1997)).
[123] *Ortiz v. Enhanced Recovery Co., LLC*, No. 3:18-CV-1347-D, 2019 WL 2410081, at *2 (N.D. Tex. June 6, 2019) (quoting *Hunsinger v. Sko Brenner Am., Inc.*, 2014 WL 1462443, at *3 (N.D. Tex. Apr. 15, 2014).
[124] Part was used to fund the Debtor's mother's business.
[125] 15 U.S.C. § 1692a(6); *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. CIV.A. 09-4369 R, 2010 WL 1424398, at *4 (E.D. La. Apr. 5, 2010) (citing *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir.1985)).
[126] *Hunsinger v. SKO Brenner American, Inc.*, No. 3:13-cv-0988-D, 2013 WL 3949023, at *3, n.4 (N.D. Tex. Aug. 1, 2013) (quoting *Townsend v. Fed. Nat'l Mortg. Ass'n*, 923 F.Supp.2d 828, 840 (W.D.Va. 2013)).
[127] *Hunsinger v. SKO Brenner Am., Inc.*, No. 3:13-CV-0988-D, 2013 WL 3949023, at *3 (N.D. Tex. Aug. 1, 2013).

actions in the context of each section of the FDCPA it allegedly violated (Sections 1692e, 1692f, 1692b(1), and 1692a(2)).

**15 U.S.C. § 1692e**

The FDCPA prohibits debt collectors from using "false, deceptive, or misleading representations in connection with the collection of any debt." 15 U.S.C. § 1692e. "Without limiting this general ban, § 1692e enumerates 16 categories of conduct that qualify as false or misleading."[128] The Debtor alleges that Wells Fargo violated one of the sixteen categories – namely, Section 1693e(14): "[t]he use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization."[129] Specifically, the Debtor alleges that collecting the Debtor's mortgage loan debt under the name "America's Servicing Company" or "ASC" rather than its own name "Wells Fargo" was a deceptive effort to conceal its involvement with customers like the Debtor.[130]

When determining whether debt collection violates Section 1692e(14), the Fifth Circuit views it from the perspective of the "unsophisticated or least sophisticated consumer."[131] The court must "assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors. At the same time [it does] not consider the debtor as tied to the very last rung on the [intelligence or] sophistication ladder."[132] "This standard serves the dual purpose of protecting all consumers, including the inexperienced, the untrained and the credulous, from deceptive debt collection practices and protecting debt collectors against liability for bizarre or idiosyncratic consumer interpretations of collection materials."[133]

---

[128] *Sheriff v. Gillie*, 136 S. Ct. 1594, 1598 (2016) (quotation marks omitted).
[129] 15 U.S.C. § 1692e(14).
[130] *Plaintiff's Original Complaint* [DE #1] at 52.
[131] *Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 511 (5th Cir. 2016).
[132] *Id.* (internal quotation marks omitted) (alteration in original).
[133] *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1236 (5th Cir. 1997).

In order to violate Section 1692e(14) of the FDCPA, a debt collector must use a name other than its "true name." "Although the Fifth Circuit has not defined 'true name' for the purposes of Section 1692e, federal courts routinely hold that a debt collector is not liable—as a matter of law— under Section 1692e(14) for the use of a registered trade, fictitious, or assumed name."[134] "Protecting the use of a registered name, then, is consistent with the FTC's guidance that a debt collector may use a name that does not misrepresent its identity without violating the FDCPA."[135] Thus, only certain, deceptive name variations rise to the level of violation of the FDCPA. "Section 1692e was enacted against a backdrop of cases in which courts held that communications designed to create a false sense of urgency were deceptive."[136] Here, the evidence does not suggest Wells Fargo's use of the trade name "America's Servicing Company" created a sense of urgency or otherwise deceived the Debtor.

## 15 U.S.C. § 1692f

The FDCPA prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. Like Section 1692e, 1692f includes a non-exclusive list of prohibited collection actions. Section 1692f(1) prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating a debt or permitted by law." Courts construe this provision to include the collection of debts that are not actually owed.[137]

---

[134] *Hsu v. Enhanced Recovery Co., LLC*, No. 1:17-CV-128-RP, 2018 WL 315758, at *3 (W.D. Tex. Jan. 5, 2018). *citing Starosta v. MBNA Am. Bank, N.A.*, 244 Fed.Appx. 939, 941 (11th Cir. 2007).

[135] *Hsu v. Enhanced Recovery Co., LLC*, No. 1:17-CV-128-RP, 2018 WL 315758, at *3 (W.D. Tex. Jan. 5, 2018).

[136] *Peter v. GC Servs. L.P.*, 310 F.3d 344, 352 (5th Cir. 2002) (citing *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 215 (9th Cir.1979)).

[137] *Heathman v. Portfolio Recovery Associates, LLC*, 2013 WL 755674 at *4 (granting summary judgment in favor of plaintiff on 1692f claim where plaintiff did not owe the debt for which defendant sued her); *Gass v. CitiMortgage, Inc.*, 2012 WL 3201400 *15 (N.D. Ga. June 25, 2012) ("1692f refers to unfair or unconscionable acts in the vein of collecting debt which is not owed"*); Ramirez v. Mr. Transmission, et al (In re Ramirez)*, 2014 WL 2522148 (Bankr. S.D. Tex. June 4, 2014) ("Although an illegal action is not enumerated as an unconscionable action in § 1692f, it is undoubtedly included within the scope of § 1692f.").

The Debtor alleges that Wells Fargo violated both Sections 1692e (generically) and 1692f (generically and Section 1692f(1) specifically) in the following ways:

(1) by repeatedly seeking post-petition payments from the Debtor that included pre-petition escrow amounts that were also included in Wells Fargo's proof of claim,

(2) by sending an escrow overage payment to the Chapter 13 trustee in March of 2016 instead of reducing the amount of its proof of claim,

(3) by failing to disclose the reinstatement quote from June 2014 that showed that Wells Fargo's proof of claim was overstated,

(4) by intentionally and repeatedly producing incomplete loan records in response to the Debtor's requests for such records.

(5) by filing a notice of mortgage payment change on March 9, 2016, which misrepresented the amount of the Debtor's mortgage loan payments and misrepresented the basis for the escrow account overage,

(6) by attempting to collect escrow advances directly from the Debtor and through its proof of claim, and

(7) by falsely representing that it sent the Debtor's counsel a response to Plaintiff's October 12, 2015, request for information on November 16, 2015, when it did not actually send that response until December 31, 2015.[138]

As noted above, the FDCPA applies only to debt collection activities. Allegations numbers (2), (3), (4), and (7) above are clearly not collection activities and therefore are not subject to the FDCPA. Allegation numbers (5) and (6) above are not collection activities either, but they warrant a closer look.

Allegation number (5) relates to a payment change notice (a Rule 3002.1 notice) filed in the 2014 Bankruptcy by America's Servicing Company on March 9, 2016. Rule 3002.1(b) addresses the largely administrative task of disclosing changes in monthly payment amounts on the claims register of a bankruptcy case. It requires claim holders to "file and serve on the debtor,

---

[138] *Plaintiff's Original Complaint* [DE # 1] at 50.

debtor's counsel, and the trustee a notice of any change in the payment amount, including any change that results from an interest-rate or escrow-account adjustment, no later than 21 days before a payment in the new amount is due."[139]  This court found almost no authority to support the proposition that filing a Rule 3002.1 notice constitutes a collection activity to support an FDCPA claim.  It found only one case that supports the Debtor's position.  The bankruptcy court in *In re Trevino* held that filing a Rule 3002.1(b) notice is collection activity under the FDCPA because it "is intended to result in some recovery for the creditor on the debt set out within the notice…"[140] However, the same reason can be applied to anything a creditor may file in a bankruptcy case, including a proof of claim.  By finding that filing a proof of claim constituted a collection activity, the *Trevino* court extrapolated that filing a Rule 3002.1 notice is also a collection activity.  This court respectfully disagrees with the premise that filing a proof of claim is collection and instead sides with the body of decisions that hold the opposite.  Thus, for the reasons stated below, filing either a Rule 3002.1(b) notice or a proof of claim is not a collection activity that can support an FDCPA claim.

Allegation number (6) relates to the proof of claim filed in the 2014 Bankruptcy on July 11, 2014.  Many courts have expressly found that filing a proof of claim is not a "collection activity."  They hold that an FDCPA claim cannot be predicated on a creditor's filing of a proof of claim for two reasons.[141]  First, finding otherwise would lead to inconsistency within the bankruptcy code:

> If filing a proof of claim constituted a "collection" activity, then filing proofs of claim under § 502(b) would be fundamentally at odds with language in § 362(a)(6) providing that the filing of a petition "operates as a stay, applicable to all entities, of ... any act

---

[139] Fed. R. Bankr. P. 3002.1(b)(1).

[140] *In re Trevino*, 615 B.R. 108, 133-134 (Bankr. S.D. Tex. 2020).

[141] *In re Humes*, 496 B.R. 557, 581 (Bankr. E.D. Ark. 2013) (collecting cases).

to *collect,* assess, or recover a claim against the debtor that arose before the commencement of the case under this title."[142]

Indeed, the bankruptcy process, through the automatic stay and proofs of claim, provides an avenue to resolve disputed claims. "The Bankruptcy Code allows creditors to assert any claim, even if that claim is contingent, unmatured, or disputed."[143]

The second reason why proofs of claim cannot be the basis of an FDCPA claim is that it would discourage creditors from filing claims at all. Filing a claim is ultimately "a request to participate in the distribution of the bankruptcy estate under court control… not an effort to collect a debt from the debtor who enjoys the protection of the automatic stay."[144] The court agrees with these reasons. By filing a proof of claim and a Rule 3002.1 notice, Wells Fargo did not use "unfair or unconscionable means to collect or attempt to collect any debt" because it was not collecting a debt at all.[145]

Finally, the Debtor alleges that Wells Fargo unfairly or unconscionably collected a debt not actually owed by repeatedly seeking post-petition payments from the Debtor that included pre-petition escrow amounts that were also included in Wells Fargo's proof of claim. The court is not clear about what collection activities Wells Fargo allegedly engaged in to seek these payments. The allegation is premised on the double-collection of escrow, and the trial testimony does not

---

[142] *In re Jenkins*, 456 B.R. 236, 240 (Bankr. E.D.N.C. 2011).
[143] *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 356 (5th Cir. 2008) (citing 11 U.S.C. §§ 101(5), 501(a)).
[144] *In re McMillen*, 440 B.R. 907, 912 (Bankr. N.D. Ga. 2010).
[145] This court is not holding that there can never be a violation of the FDCPA within the confines of a bankruptcy case or that the Bankruptcy Code entirely precludes invocation of the FDCPA during a bankruptcy case (indeed, the court is finding one FDCPA violation here with the sending of the May 4, 2016 letter). However, the court does not believe that the filing of a proof of claim or a Rule 3002.1 notice will generally constitute the type of "collection activity" that the FDCPA is designed to address—given that: (a) the filing of these documents are requirements imposed by the Bankruptcy Code and Rules in order for a creditor to share in distributions of the bankruptcy estate; (b) their filing occurs under a court-supervised process generally initiated by the debtor and overseen by a trustee and U.S. Trustee system; and (c) there are tools such as Rule 11 and Section 105 to address filings that are found to have been made in bad faith or not grounded in facts or law.

suggest that this occurred. Wells Fargo's accounting segregated a portion of the payments it received each month into a separate escrow bucket to ensure that there was no double collection through the proof of claim.[146] The evidence does not support a finding that Wells Fargo engaged in unconscionable collection activity in regard to this escrow.

### 15 U.S.C. § 1692b(1)

The FDCPA prohibits a debt collector from stating that a consumer owes any debt when the debt collector communicates with third parties for the purpose of acquiring location information about that consumer. 15 U.S.C. § 1692b(1). The Debtor alleges that Wells Fargo violated this provision when it erroneously sent the Debtor another consumer's returned check on May 4, 2016.[147] Section 1692b(1) clearly does not apply because the letter does not request location information. Even if it did, the Debtor lacks standing because it was not her debt revealed to a third party. 15 U.S.C. § 1692b(1) cannot be the basis of recovery.

### 15 U.S.C. § 1692a(2)

Finally, 15 U.S.C. § 1692a(2) prohibits debt collectors from communicating with a consumer in connection with the collection of any debt "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address …." The Debtor alleges that the letter she received from Wells Fargo dated May 4, 2016 (the one with another consumer's insufficient funds returned check enclosed) violated Section 1692a(2). The letter notified the Debtor that Wells Fargo would only accept payments henceforth in certified funds. It instructed the Debtor to "[p]lease send your payment to us at the address below. Remember to write your name and mortgage account number

---

[146] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 127:22-130:4 and 148:3-18.
[147] Plaintiff's Exhibit 356.

on your payment."[148]  ***The court concludes that this letter did, indeed, constitute collection activity violative of 15 U.S.C. § 1692a(2)***.  In May of 2016, the Debtor was being represented by counsel,[149] and Wells Fargo had knowledge of her attorney's contact information because of the back-and-forth communication between Kellett & Bartholow PLLC and Locke Lord over the RESPA requests in March of 2016.[150]  Therefore, Wells Fargo violated 15 U.S.C § 1692a by sending the Debtor the May 4, 2016 letter.

## Damages Under the FDCP

Having determined that Wells Fargo violated Section 1692a(2) of the FDCPA on one occasion (*i.e.*, the May 4, 2016 letter), the next issue is to determine what damages the FDCPA allows.  Section 1692k provides:

> Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of
>
> > (1) any actual damage sustained by such person as a result of such failure;
> >
> > (2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000;
> > … and
> >
> > (3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.[151]

The FDCPA's statutory cap is per action rather than per violation.  The plain language of the statute simply states that damages beyond actual damages may not exceed $1,000 "in the case of any action by an individual."  "The FDCPA does not on its face authorize additional statutory damages of $1,000 per violation of the statute, of $1,000 per improper communication, or of

---

[148] Plaintiff's Exhibit 356.
[149] Plaintiff's Exhibit 189.
[150] Plaintiff's Exhibit 178 at 004553; Plaintiff's Exhibit 179 at 004612; Plaintiff's Exhibit 180 at 004697.
[151] 15 U.S.C § 1692k(a).

$1,000 per alleged debt."[152]  ***Unlike RESPA, actual damages are not required for standing under FDCPA.***[153]   The apparent inconsistency is reconciled by the FDCPA's purpose "to protect consumers who have been victimized by unscrupulous debt collectors, regardless of whether a valid debt actually exists."[154]

Here, like with the RESPA correspondences, the court determines that there is insufficient tangible evidence of actual damages associated with the May 4, 2016 letter.  The statements of emotional stress—while certainly not dismissed out of hand here—were a bit lacking as to any causal connection to this particular letter.  However, the court will award $1,000 in statutory damages for Wells Fargo's violation of Section 1692a(2) of the FDCPA along with any reasonable attorneys' fees that may be shown in a future hearing to have been incurred in addressing this letter.

### D.  Were There Violations of Fed. R. Bankr. P. 3002.1(b) that Entitle the Debtor to Relief?

The Debtor alleges that Wells Fargo failed to file payment change notices as required during the 2011 Bankruptcy.

Fed. R. Bankr. P. 3002.1 became effective on December 1, 2011,[155] to aid in the implementation of 11 U.S.C. § 1322(b)(5), which permits a Chapter 13 debtor to cure a default and maintain payments on a home mortgage over the course of the debtor's plan.[156] Rule 3002.1(b) provides that "[t]he holder of the claim shall file and serve on the debtor, debtor's counsel, and the

---

[152] *Harper v. Better Bus. Servs., Inc.*, 961 F.2d 1561, 1563 (11th Cir. 1992); *Wright v. Fin. Serv. of Norwalk, Inc.*, 22 F.3d 647, 650 (6th Cir. 1994); *Peter v. GC Servs. L.P.*, 310 F.3d 344, 352 (5th Cir. 2002).
[153] *Robey v. Shapiro, Marianos & Cejda, L.L.C.*, 434 F.3d 1208, 1212 (10th Cir.2006) (quoting *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 307 (2d Cir.2003)).  *See also Meraz v. M. Susan Rice, P.C.*, No. SA-09-CA-138-OG, 2009 WL 10669232, at *8 (W.D. Tex. May 15, 2009).
[154] *McCartney v. First City Bank,* 970 F.2d 45, 47 (5th Cir.1992).
[155] The Supreme Court ordered that the new rule "shall take effect on December 1, 2011, and shall govern in all proceedings in bankruptcy cases thereafter commenced and, insofar just and practicable, all proceedings then pending."  Order, United States Supreme Court concerning Bankruptcy Rules (April 26, 2011).
[156] Fed. R. Bankr. P. 3002.1, 2011 Committee Notes.

trustee a notice of any change in the payment amount, including any change that results from an interest rate or escrow account adjustment, no later than 21 days before a payment in the new amount is due."[157]   Assuming such a notice is filed, a party who objects to it may file a motion to determine the corrections of the change.   If a holder of the claim fails to provide any information required by Rule 3002.1(b), the court may, after notice and hearing, take either or both of the following actions: "(1) Preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or harmless; or (2) Award other appropriate relief, including reasonable expenses and attorneys' fees caused by the failure."[158]   When Rule 3002.1 became effective, it applied only to principal residence loans that were "provided for under Code Section 1322(b)(5) in the debtor's plan" (*i.e.*, cure-and-maintain plans).[159]   In 2016, the reference to Section 1322(b) was deleted from Rule 3002.1(a) to clarify that Rule 3002.1 applies whenever a debtor's plan provides for the maintenance of post-petition payments on a home mortgage.[160]

The evidence showed that Wells Fargo, indeed, failed to file payment change notices in the 2011 Bankruptcy (although it did file them in the 2014 Bankruptcy).[161]   The Debtor alleges that Wells Fargo should have filed payment change notices on at least three occasions in the 2011 Bankruptcy: at least once with respect to the post-petition interest being collected on pre-petition arrearages,[162] and twice for escrow adjustments.[163]   On the contrary, Wells Fargo argues that its

---

[157] Fed. R. Bankr. P. 3002.1(b).
[158] Fed. R. Bankr. P. 3002.1(i).
[159] Fed. R. Bankr. P. 3002.1(a) (2011 version).
[160] 9 Collier on Bankruptcy P 3002.1.01 (16th 2021).
[161] *Transcript of Hearing Held June 28, 2021* [DE # 277] at 59:9-10.
[162] *Plaintiff's Post-Trial Brief* [DE #284] at 23.
[163] *Plaintiff's Trial Brief* [DE # 203] at 13.

obligation to file payment change notices in the 2011 Bankruptcy arose only after the adoption of

the TRCC on October 31, 2013, which finally made the Debtor's plan a "cure-and-maintain" plan.

As the court noted earlier, the erroneous and nonsensical form-generated Chapter 13 plan

first filed during the 2011 Bankruptcy by the Debtor's original counsel (now disbarred) has been

mischaracterized by both parties in this litigation as a "paid-in-full" plan.   This is a distortion of

reality.   The Debtor's former counsel ineptly chose the wrong section of the form-generated

Chapter 13 plan to list her mortgage debt – listing it in a section intended for "910 – vehicles" that

is for indebtedness that cannot be crammed down.   Wells Fargo (and others, for that matter) should

have recognized this as an error.   And, of course, the error was ultimately corrected.   ***In any event,
since Wells Fargo started collecting an additional amount – i.e., post-petition interest on pre-
petition arrearages – the court finds that Wells Fargo was obligated to file a payment change
notice in the 2011 Bankruptcy in December 2011 (when Rule 3002.1 first went into effect).***   To

hold otherwise would be inequitable.   Any reasonable person could and should have realized that

the so-called "paid-in-full" plan was actually an incorrectly drafted plan – a scrivener's error of

inept counsel.   But, since Wells Fargo was taking the post-petition interest, it should have filed a

Rule 3002.1 notice.

As described in the court's "Additional Findings of Fact" section, Wells Fargo's

accounting of how it applied payments is convoluted.   On the one hand, it shows adjustments made

in Wells Fargo's accounting of escrow.   On the other hand, it lacks a clear showing of when the

Debtor's payments changed and by what amount.   At the very least, the court acknowledges three

conclusions supported by the evidence: (1) that the escrow account disclosure statements show

different monthly payments at the beginning and end of the 2011 Bankruptcy, (2) that the addition

of post-petition interest on pre-petition arrearage would have either increased the Debtor's overall

monthly payment or reduced the portion of the Debtor's payment that actually applied to the debt, and (3) Wells Fargo always treated the plan as a cure-and-maintain (never re-amortizing the loan) and simply proceeded with its annual escrow analyses. The court finds by a preponderance of the evidence that Wells Fargo violated Rule 3002.1(b) multiple times in the 2011 Bankruptcy. While it is difficult to determine how many times Wells Fargo violated the rule, the court believes that the Debtor has credibly established it was three times: at least once with respect to the change resulting from the payment of post-petition interest on pre-petition arrearages, and twice for its escrow adjustments.

The court has the discretion to impose one or both actions described in Bankruptcy Rule 3002.1(i). Given the lack of clarity on the issues and the context of the current litigation, the court determines that it is improper and nonsensical to "[p]reclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case."[164] Instead, it will rely on Rule 3002.1(i)(2) and award "reasonable expenses and attorneys' fees caused by the failure."[165] The court will determine the amount of "reasonable expenses and attorneys' fees caused by the failure" to file the Rule 3002.1 payment change notices (starting in December 2011 and throughout the 2011 Bankruptcy) at a future hearing. This will be a difficult exercise establishing what attorneys' fees and expenses were caused by the absence of Rule 3002.1(b) payment change notices. The court gives guidance as follows: they would not necessarily have to have occurred during the 2011 Bankruptcy *per se*.

There has been some controversy among the courts as to whether Bankruptcy Rule 3002.1(i) allows bankruptcy courts to sanction creditors who fail to file a Rule 3002.1(b) or (c)

---

[164] Fed. R. Bankr. P. 3002.1(i)(1).
[165] The court does not believe that Wells Fargo's failure to apply with Rule 3002.1(b) caused any specific damages (other than attorneys' fees incurred in trying to decipher payment amounts Wells Fargo was applying).

notice.  Since the rule itself allows courts to "award other appropriate relief, including reasonable expenses and attorneys' fees caused by the failure," the question boils down to what "other appropriate relief" means.[166]  Even if a bankruptcy court may impose sanctions on a party such as Wells Fargo for violations of Rule 3002.1(b), the court hesitates to do so here, because imposing damages beyond attorneys' fees is essentially punitive sanctioning, and the evidence does not clearly show when Wells Fargo changed the Debtor's payment in the first case and by how much; further, the evidence does not seem to support bad faith but, rather, business operational errors/oversight or, at worst, sloppiness.

On balance, the court believes it is appropriate to award the Debtor reimbursement of her reasonable attorneys' fees and expenses that can be shown to have been incurred due to Wells Fargo's failure to comply with Bankruptcy Rule 3002.1(b).  Presumably, this would be services expended trying to reconstruct when the Debtor's payments changed and how this affected the reduction of the Debtor's home loan balance.  Showing this causal connection will be a tedious exercise, to be sure.

### E.  Were There Violations of the Automatic Stay that Entitle the Debtor to Relief?

The Bankruptcy Code's automatic stay, of course, prohibits, among other things, creditors from engaging in acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," and acts "to collect, assess, or recover a claim against the debtor that arose before the commencement" of a bankruptcy proceeding.[167]  In other words, the automatic stay prohibits the collection of any pre-petition debt through post-petition

---

[166] *See In re Blanco*, 633 B.R. 714 (Bankr. S.D. Tex. 2021); *In re Gravel*, 6 F.4th 503 (2d Cir. 2021); *and In re Heard*, No. BR 15-35564-PCM13, 2021 WL 3540412 (Bankr. D. Or. Aug. 11, 2021).
[167] 11 U.S.C. § 362(a)(3) and (6).

payments.[168]   It is the Debtor's burden to prove a willful violation of the automatic stay by a preponderance of the evidence.   Pursuant to section 362(k), an individual injured by any willful violation of the automatic stay shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.[169]

With regard to any alleged automatic stay violations here, there is one possibly problematic wrinkle.   Specifically, this current bankruptcy case (*i.e.,* the 2014 Bankruptcy) was the Debtor's second case.   If a new bankruptcy case is filed within a year of the dismissal of a previous bankruptcy, the stay "shall terminate with respect to the debtor on the 30th day after the filing of the later case."[170]   To prevent termination of the stay with respect to a debtor, a party must move to extend the stay "after notice and a hearing completed before the expiration of the 30-day period."[171]   Recall, once again, that the Debtor's first bankruptcy counsel made many mistakes in her representation of the Debtor. Sadly, one of these was that the attorney filed no motion to extend the automatic stay in the 2014 Bankruptcy.[172]   Therefore, the automatic stay was terminated with respect to the Debtor 30 days after her 2014 Bankruptcy was filed.   However, the automatic stay was not terminated with respect to the property of the bankruptcy estate.[173]

The Debtor alleges that Wells Fargo wrongfully exercised control over property of the estate by retaining the post-petition interest paid by the Debtor, during both the 2011 Bankruptcy and part of the 2014 Bankruptcy, on pre-petition arrearages as a "fee" instead of forwarding the funds to the mortgage holder to be applied to the mortgage loan amount.   The court agrees.   Wells

---

[168] *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 353 (5th Cir. 2008) (citing *United States v. Ripley (In re Ripley)*, 926 F.2d 440, 443 (5th Cir. 1991)).
[169] *Young v. Repine (In re Repine)*, 536 F.3d 512, 522 (5th Cir.2008); *In re Bruner-Halteman*, No. 12-32429-HDH-13, 2016 WL 1427085, at *8 (Bankr. N.D. Tex. Apr. 8, 2016).
[170] 11 U.S.C. § 362(c)(3)(A).
[171] 11 U.S.C. § 362(c)(3)(B).
[172] Defendant's Exhibit 90.
[173] *Rose v. Select Portfolio Servicing, Inc.*, 945 F.3d 226, 230 (5th Cir. 2019) ("§ 362(c)(3)(A) terminates the stay only with respect to the debtor; it does not terminate the stay with respect to the property of the bankruptcy estate.")

Fargo exercised control over property of the estate.   **_The property should have either been_**

**_returned to the Chapter 13 Trustee (to be disbursed to unsecured creditors or back to the_**

**_Debtor)_**, at such time as the Debtor finally had in place a normal "cure and maintain" plan, or—at

a minimum—it should have been payable to the mortgage holder to pay down the Debtor's balance

in accordance with contractual terms.

### (i)      Improper Retention by Wells Fargo (as Servicer) of Post-Petition Interest on the Pre-Petition Arrearage

To be clear, on the issue of the post-petition interest retained by Wells Fargo on pre-petition

arrearages (sometimes referred to as "Trustee Interest" by the parties), the court holds that Wells

Fargo was not entitled to keep the interest on arrearage that accrued during either one of the

Debtor's two bankruptcy cases.   At the very least, Wells Fargo should have re-amortized the

Debtor's loan once the chaotic 2011 Bankruptcy was dismissed.   Doing so would have put the

parties back to what the loan documents required, and the contract would have required applying

the "Trustee Interest" to the mortgage loan balance.   Any plan distributions on the mortgage

holder's claim had to be applied contractually once the Debtor's 2011 Bankruptcy case was

dismissed.[174]   Under the *Oparaji* case and the operation of 11 U.S.C. § 349, the court's acceptance

of the Debtor's plan that provided for payment of interest on arrears no longer bound the parties,

eliminating the interest and requiring the Debtor's payments to be applied contractually.[175]

Moreover, in the second 2014 Bankruptcy, even during the phase of the "cure-and-

maintain" plan that still included "Trustee Interest," it would appear that this provision violated

Section 1322(e) of the Bankruptcy Code.   The court believes Wells Fargo was aware of this

---

[174] *In re Oparaji*, 698 F.3d 231, 238 (5th Cir. 2012) ("the pre-discharge dismissal of a bankruptcy case returns the parties to the positions they were in before the case was initiated").
[175] *Id.*

violation, and it explains why Wells Fargo simply stashed the interest in a "Fee" bucket—not being sure what to do with it.

Section 1322(e) was enacted to overrule the Supreme Court's decision in *Rake v. Wade*, wherein the Court—relying on Sections 506(b) and 1325(a)(5) of the Bankruptcy Code—held that a debtor who is curing a home mortgage default must pay not only interest on the principal of his loan, but also interest on interest, and interest on other elements of an arrearage (such as interest on late fees, escrows, *etc.*).[176] Section 1322(e) provides that the amount necessary to cure a default is to be determined in accordance with the underlying agreement and applicable nonbankruptcy law.  The legislative history indicates that the intent of Section 1322(e) was to overrule *Rake v. Wade,* which required interest on arrears even when applicable law prohibited it and even when it was not contemplated by the parties' agreement.[177]  The legislative history further indicates that such payments would be a "windfall to secured creditors" – potentially at the expense of unsecured creditors.[178]  Section 1322(e) essentially means that the amount necessary to cure a default in bankruptcy should be the same as would be required outside of bankruptcy.  As further summarized in the *Collier* treatise, in order for a mortgage lender to be entitled to interest on interest in a Chapter 13 plan: "First, the interest or charges must be required under the original agreement, and second, they cannot be prohibited by state law."[179]

Here, interest on arrears is not required under the underlying mortgage documents.  Thus, there is no evidence or argument in this court's estimation that justifies the mortgage holder being paid or retaining the post-petition interest on pre-petition arrears.  This would be the type of

---

[176] *Rake v. Wade*, 508 U.S. 464 (1993).

[177] 8 COLLIER ON BANKRUPTCY ¶ 1322.19 (citing H.R. Rep. No. 835, 103d Cong., 2d Sess. 55 (1994).

[178] *Id.*

[179] *Id.*  (citing *In re Young*, 310 B.R. 127 (Bankr. E.D. Wis. 2003); *In re Hatala*, 295 B.R. 62 (Bankr. D. N. J. 2003); *In re Hoover,* 254 B.R. 492 (Bankr. N.D. Ok. 2000); *In re Bumgarner*, 225 B.R. 327 (Bankr. D.S.C. 1998).

windfall that Section 1322(e) was intended to avoid.  But, even if the mistake (*i.e.,* the violation of Section 1322(e)) should somehow be allowed to stand during the phase of the 2014 Bankruptcy when the Debtor's plan provided for post-petition interest on pre-petition arrears, certainly there is no legal basis supported by the evidence or argument for the servicer keeping the "interest on interest" here (instead of sending it on to the mortgage holder, Wilmington).

The Debtor is entitled to damages for this automatic stay violation equal to: a return of this post-petition interest on arrears ($18,609.85); interest calculated at the federal judgment rate thereon, from the time this amount was wrongfully withheld; plus reasonable attorney's fees incurred as a result of this automatic stay violation. With regard to the reimbursement of her reasonable attorneys' fees and expenses, they will have to be shown to have been incurred due to Wells Fargo's failure to return these funds.  Showing this causal connection will be a tedious exercise, to be sure.

### (ii)    Wells Fargo's Improper Retention of and Exercise of Control Over the Escrow Surplus for 2014 Property Taxes for an Unreasonable Length of Time

Additionally, the court believes that Wells Fargo wrongfully exercised control over property of the estate—namely, the escrow surplusage relating to the Debtor's 2014 property taxes, in the amount of $4,671.27—by retaining this amount for an unreasonable amount of time, into years 2015 and 2016, instead of returning it to the Debtor.  The evidence showed Wells Fargo eventually sent the surplusage to the Chapter 13 Trustee in March 2016.  To the extent Wells Fargo urges that "there was always an escrow shortage in the Debtor's account," and that perhaps its retention of the funds was warranted for this reason, this is no justification.  Any historical shortage would obviously be a reference to pre-petition escrow shortages—and these were being addressed as arrearages under the plan. Using this rationale for holding onto the $4,671.27 overage was essentially exercising control over property of the estate on account of prepetition debt. The Debtor

is entitled to damages for this automatic stay violation equal to: a return of the $4,671.27; interest calculated at the federal judgment rate thereon, from the date in year 2015 that the Debtor first notified Wells Fargo of her payment of the 2014 property taxes; plus reasonable attorney's fees incurred as a result of this automatic stay violation.

With regard to the reimbursement of her reasonable attorneys' fees and expenses, they will have to be shown to have been incurred due to Wells Fargo's failure to return these funds. Showing this causal connection will also be a tedious exercise.

The court has considered carefully whether any further actual or punitive damages are warranted as a result of these stay violations by Wells Fargo. First, in this regard, the court concludes that all actions of Wells Fargo must be deemed willful. They certainly were not inadvertent. Second, as mentioned earlier, the Debtor, her mother, and her children provided testimony regarding the Debtor's emotional distress during the years of her bankruptcy case. There was also extensive testimony (with pictures) suggesting that the Property needed extensive maintenance and repair—all of which might have been addressed by now if the Debtor had some of the funds that Wells Fargo wrongfully withheld (or if the funds had been used to pay-off her loan sooner). This court does not doubt for a moment that Ms. Neria felt extreme emotional stress regarding her mortgage problems. However, the court cannot conclude that this stress was directly attributable to Wells Fargo's conduct with regard to these stay violations outlined. Moreover, the home deterioration cannot really be directly tied to not having funds that Wells Fargo retained. Further, the court cannot conclude punitive damages were warranted. As stated earlier, this case presented an accounting morass, and the court has the nagging feeling that this did not all have to be so confusing for everyone. But, this is not a sad tale of a debtor losing her house or enduring harassing, abusive collection tactics. Rather, it is a story of great frustration and confusion.

Happily, the Debtor has now paid off her plan and underlying mortgage.  While mistakes were made, and confusion often abounded, this cannot all be attributed to Wells Fargo or its personnel.

## V. CONCLUSION

In conclusion, the Debtor is awarded:

(1) For Wells Fargo's violation of the FDCPA, 15 U.S.C. § 1692a(2), **$1,000** of statutory damages, plus any reasonable attorneys' fees that may have been incurred in addressing Wells Fargo's letter to the Debtor dated May 4, 2016;[180]

(2) For Wells Fargo's failure to comply during the 2011 Bankruptcy with Bankruptcy Rule 3002.1(b), reasonable attorneys' fees that may have been incurred due to this failure to comply;

(3) For Wells Fargo's automatic stay violation (wrongful exercise of control over property of the estate—specifically, wrongful retention of **$18,609.85** of the post-petition interest on pre-petition arrearage)—damages in this amount, plus interest calculated at the federal judgment rate thereon, plus reasonable attorneys' fees incurred as a result of this violation of the automatic stay; and

(4) For Wells Fargo's additional automatic stay violation (wrongful exercise of control over the **$4,671.27** escrow surplusage relating to the Debtor's 2014 property taxes, for an unreasonable amount of time, into years 2015 and 2016, instead of returning it to the Debtor), damages in this amount, plus interest calculated at the federal judgment rate thereon, plus reasonable attorneys' fees incurred as a result of Wells Fargo's violation of the automatic stay.

All other relief not expressly addressed herein is hereby denied.[181]

The court will hold a separate hearing to determine the award of reasonable attorneys' fees listed above.  Counsel should contact the courtroom deputy for a setting.

It is so **ORDERED**.

### ### <u>End of Amended Finding of Facts and Conclusions of Law</u> ###

---

[180] Plaintiff's Exhibit 356.
[181] This includes the Debtor's claim for "abuse of bankruptcy process."